**KNEUPPER & COVEY, PC**
Kevin Kneupper, Esq. (CA SBN 325413)
kevin@kneuppercovey.com
4475 Peachtree Lakes Dr.
Berkeley Lake GA 30096
Tel: 512-420-8407

*Attorneys for Plaintiff Stephanie Cummings*
*and the putative Class*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHANIE CUMMINGS,<br><br>        Plaintiff,<br><br>    vs.<br><br>JOHN DOES 1-10,<br><br>        Defendant(s) | Case No.: 2:19-CV-08766<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>(1) Violation of California's Consumer Legal Remedies Act;<br>(2) Violation of California's False Advertising Law;<br>(3) Violation of the Unfair and Fraudulent Prongs of California's Unfair Competition Law;<br>(4) Violation of the Unlawful Prong California's Unfair Competition Law;<br>(5) Negligent Misrepresentation;<br>(6) Violation of California's Automatic Renewal Law;<br>(7) Violation of the Electronic Fund Transfer Act;<br>(8) Aiding and Abetting;<br>(9) Conspiracy.<br><br>**DEMAND FOR JURY TRIAL**. |

      Plaintiff Stephanie Cummings, individually and on behalf of all others similarly situated nationwide and in the State of California, by and through the undersigned counsel, hereby file this Class Action Complaint against Defendants, JOHN DOE 1 THROUGH 10, collectively "Defendants," and allege as follows:

**JURISDICTION AND VENUE**

1.    This Court has jurisdiction over this matter because this is a class action in which, on information and belief, the damages exceed $5 million, exclusive of interest and costs, the number of class members exceeds 100, and as demonstrated below, the parties are believed to be diverse pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). At least one of the John Doe Defendants lists an address as a post office box in Arizona, and a terms of service presented on one of the websites at issue with an unknown owner (immortelleyouth.com) selected Florida as the governing state law, suggesting that at least one of the John Doe Defendants resides in Florida. The believed scope of the damages and number of class members are based on Plaintiff's investigation and the BBB report attached as Exhibit 1.

2.    This court also has jurisdiction because Plaintiff's Electronic Fund Transfer Act claim, 15 U.S.C. § 1693e, arises under federal law.

3.    This Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367.

4.    This Court has personal jurisdiction over Defendants because Defendants are authorized to conduct and do business in California, including this District. Defendants marketed, promoted, distributed, and sold their products in California, and Defendants have sufficient minimum contacts with this State and/or sufficiently availed themselves of the markets in this State through their promotion, sales, distribution, and marketing within this State, including this District, to render the exercise of jurisdiction by this Court permissible.

5.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) and (b) because a substantial part of the events giving rise to Plaintiffs' claims occurred while they resided in this judicial district, including signing up for a "free trial" of the products at issue.

## NATURE OF THE ACTION

6.    This suit involves a form of fraud and cybercrime that has become increasingly common across the Internet, known as the celebrity free trial scam. These

scams entice consumers with fake celebrity endorsements, claiming that well-known celebrities have either endorsed or created a new line of cosmetics products. The operators of these scams offer consumers a "free trial"—just pay the shipping and handling, and you can try these amazing new products for free.

7.    But the products are anything but free. The scammers' only goal is to fraudulently obtain the victim's credit card or bank account information. And once they have it, they begin billing their victims for subscriptions they never signed up for, never agreed to, and were never even informed of. Using multiple websites, the scammers present one face to the consumer—a website offering the free trial with no disclosure of a subscription—and a totally different face to any banks investigating complaints, a second website which appears to fully comply with the law and fully disclose those subscriptions. But that second website, the "false front," is never actually viewed by the consumer. Instead, the consumer signs up for the fake "free trial" from a well-hidden landing page on a totally different website. Consumers are left with no recourse—the scammers have defrauded their banks into believing they consented to be billed, when in fact they did not.

8.    These scammers operate in rings, as described in Exhibit 1. Those rings generally include: (1) affiliates, who are paid to advertise the fake celebrity trials, (2) creators of the product, who sell it and commit bank fraud by operating the "false front" websites, (3) fulfillment companies, who ship the product for a variety of scammers under the pretense of being a "nutra" manufacturer, and (4) "crooked processors" who assist the scammers in avoiding detection by bank and credit card companies.

9.    These rings of scammers are structured in this way in the mistaken belief that the members of the ring will avoid liability by pretending to be legitimate businesses and pretending to have no knowledge of the actions of the others. But every member knows full well what they are doing—the fulfillment companies are often inundated with complaints on their Better Business Bureau pages, the creators of the product intentionally seek out affiliates to do their dirty work under the pretense of "independent

contractor" agreements, and the "crooked processors" openly pitch themselves as being able to help their customers avoid fraud detection and chargebacks.

10.    Mrs. Cummings was a victim of these scammers—but many others have been as well. This lawsuit seeks to identify and hold accountable the members of the civil and criminal conspiracy that defrauded her, defrauded her bank, and defrauded many other consumers.

## THE PARTIES

### Plaintiff

11.    PLAINTIFF STEPHANIE CUMMINGS is a citizen of the state of California and resides in Long Beach, California. In roughly March 2019, Mrs. Cummings signed up for a free trial of Immortelle Youth after seeing it advertised as having been endorsed by Shark Tank, and was repeatedly billed by the Defendants for a subscription she did not agree to.

### The John Doe Defendants

12.    DEFENDANTS JOHN DOE 1 THROUGH 10 are the individuals, corporations, or entities responsible for selling, advertising, shipping, and manufacturing the Immortelle Youth products, and any individuals, corporations, or entities providing the capacity to evade fraud detection through services relating to credit card or debit card processing. The true names and capacities of the Defendants sued herein as JOHN DOE 1 through 10, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names. Each of the Defendants designated as a JOHN DOE is legally responsible for the unlawful acts alleged herein. Plaintiff will seek leave of Court to amend this Complaint to reflect the true names and capacities of the JOHN DOE Defendants when such identities become known.

## FACTUAL ALLEGATIONS

### Background on Free Trial Scams

13.    The Internet has been plagued in recent years by a flood of scams targeting consumers for "free trials" that are anything but free. Relying on fake news articles and

fake celebrity endorsements, the scammers convince customers that they are signing up for a free trial of a product endorsed by a high-profile celebrity. But the customer soon discovers that they are being billed each and every month as part of a subscription they were never informed of and never agreed to. These scams are not just deceptive—they are criminal. This lawsuit seeks to shut down a ring of scammers who defrauded an unknown number of people, including the named plaintiff Stephanie Cummings.

14.     The Better Business Bureau ("BBB") issued a study in December 2018 titled "Subscription Traps and Deceptive Free Trials Scam Millions with Misleading Ads and Fake Celebrity Endorsements." Ex. 1. Written by C. Steven Baker, an International Investigations Specialist for the BBB and former Director for the Midwest Region of the Federal Trade Commission, the report explains in detail the tactics used by scammers to exploit customers who are unaware of their fraudulent techniques.

15.     According to the report, these scams have "infested the internet and social media." Ex. 1 at 1. The report provides a detailed explanation of how the scams work— one that is virtually identical to the scam that was run by the Defendants here.

16.     "You've seen them on the internet: ads or links leading to pictures of celebrities and products that sound intriguing. The ads claim these 'miracle' products will help you lose weight easily, combat wrinkles or whiten teeth. Often, fraudulent operations involved with these types of ads employ the latest internet marketing techniques and professional looking websites. You may be enticed to try these products through a 'risk-free' trial. You might think they seem like a good deal. You only have to pay $1.95 for shipping and handling. The claims look plausible, and celebrities would not endorse a product unless they believed it works. There may be a risk that the product doesn't work as claimed, but it costs next to nothing to find out. Just enter your name, address and credit card number and act quickly; supplies are limited. Better Business Bureau's (BBB's) in-depth investigative study found that many of these free trial offers are not free. They do not just send free product samples to try. If you can locate and read the fine print on the order page, or the terms and conditions buried by a link, you'll

discover that you may have only 14 days to receive, evaluate and return the product to avoid being charged $100 or more. In addition, the same hidden information may state that by accepting the offer, you've also signed up for monthly shipments of the products. Those also will be charged to your credit card and become subscription traps. Many people find it difficult to contact the seller to stop recurring charges, halt shipments and get a refund." Ex. 1 at 1.

17.    This is virtually a verbatim description of the illegal scam the Defendants perpetrated here, as described further below. And as the Better Business Bureau recognized in its study, the sellers of these products are not the only active participants in these scams: "The fraud involves a variety of players, from those who obtain the products to advertisers, shippers and credit card processors." Ex. 1 at 1.

18.    For example, the companies involved often hire "affiliates" to place advertisements for them or to create fake celebrity ads, paying them commissions. Ex. 1 at 3. Those affiliates are often hired or paid through a separate "affiliate network." *Id.*

19.    The Better Business Bureau describes the role of affiliates and affiliate networks as follows: "Many fake free trial offers use affiliate networks to advertise their products. Someone who wants to drive traffic to their website hires an affiliate network, which in turn hires individual affiliates to place advertising. The affiliates often buy space for ads or sponsored content on popular websites. Clicking on one of these ads will take people to a website where products are sold, or to a 'landing page' that then refers users to the main site for the product. Commissions are paid to the affiliate network, which in turn pays the affiliates. Affiliates can either be paid per click or per order placed. Commissions for these misleading 'free trial' offers can be $30 to $50 for every person who signs up." Ex. 1 at 6.

20.    Another typical player in the scam operations is the "fulfillment company"—the company that manufactures and ships the products to consumers. The Better Business Bureau study makes clear that these fulfillment companies are active participants in scamming consumers and are well aware of the fraudulent nature of what

they are doing: "The free trial offer operations also have to get the product shipped to victims. Often, fraudulent free trial operations use fulfillment companies to ship the products and, presumably, accept returns. One would think it would be easy to identify these companies. After all, postage has to be paid and most mail has a return address. And most products we receive contain an invoice from the seller. Because the web pages where victims place orders typically don't include physical addresses, the only address victims may have is the address of the fulfillment company. But those addresses may end up being post office boxes or mail boxes etc. and not the actual location of the warehouse." Ex. 1 at 9.

21.    A final type of participant in these scams are third party companies which assist in preventing the scammers from losing their merchant accounts with credit card companies or otherwise being flagged for their fraud: "Using a crooked processor. Banks that offer credit card processing hire Independent Sales Organizations (ISO's) to solicit and sign up merchants for them. The banks require that these agents comply with detailed rules before opening accounts to determine if they are legitimate and to monitor their activity for signs of fraud, such as reviewing chargeback rates and other suspicious activity. But what if those providing processing services are in on the fraud? The FTC has sued a number of these ISOs over the years, often alleging that these third parties were aware of the fraud or actively assisted in helping a fraudulent company evade the rules of the credit card system. For example, in one FTC case an ISO spread the credit card charges over 26 merchant accounts to disguise the fraud activity." Ex. 1 at 11.

22.    These free trial scams generally involve more than one individual or companies conspiring together and generally playing the roles described above. Believing that they can pretend that their affiliates are independent contractors, or that they can pretend to see no evil and hear no evil and thus escape legal liability, the conspirators work together as a group to profit from the fraud. But they are quite wrong to believe that they are safe—every member of these conspiracies knows full well what they are doing, and every member is liable jointly and severally for the conduct of the others.

### Plaintiff Stephanie Cummings' Experience
### With Immortelle Youth

23.    In roughly March 2019, Plaintiff Stephanie Cummings signed up for a free trial of Immortelle Youth after viewing a Facebook advertisement for the product. Mrs. Cummings recalls the advertising featuring an endorsement by members of the cast of the television show Shark Tank. The advertising stated that the total cost would be roughly $5 and did not disclose that if she did not cancel, there would be an automatic renewal of a subscription for the product. The Facebook advertisement which Mrs. Cummings viewed appeared to have been deleted when she attempted to locate it later on.

24.    On April 17, 2019, the Defendants billed Mrs. Cummings' credit card for $92.72 for a subscription attributed to Eternal Allure Eye Serum—a product she did not even sign up for. She was shipped a bottle labeled Immortelle Allure Revitalizing Eye Serum. Just five days later, on April 22, 2019, she was again billed for $93.83 for a subscription attributed to "ENDLESSYOU" (presumable Endless Youth). She was billed again for $93.83 on May 22, 2019, and twice for separate bills for $93.83 on June 24, 2019. In total Mrs. Cummings was billed $410.21 for subscriptions she did not agree to and which were presented to her as a "free trial" with no disclosure that she would be billed again, or that she would be signed up for a subscription to two entirely different products.

25.    Mrs. Cummings called three separate numbers associated with the Immortelle Youth products. Two had been disconnected. The individuals who answered on behalf of Immortelle Youth demanded that Mrs. Cummings ship the product back to them at a post office box in Arizona: P.O. Box 52022, Phoenix AZ 85072. On June 25, 2019, Mrs. Cummings shipped one of the skin cream bottles back to that address.

26.    The Defendants, however, ultimately agreed only to remove $35.00 of the charges they had made to Mrs. Cummings account. Mrs. Cummings called Chase Bank on July 15, 2019 to attempt to report the fraud. But relying on the website http://www.immortelleyouth.com, a website run by the Defendants for the express

purpose of defrauding consumers, banks, and law enforcement, Chase Bank concluded that the charges had been authorized. This conclusion is not surprising—this website includes a terms of service agreement and makes clear disclosures of the terms of the agreement.

27.     That website, however, was not the website on which Mrs. Cummings signed up for a free trial of the Immortelle Youth skin product. Instead, in a move typical of this kind of scam, the Defendants were operating two separate websites—one, immortelleyouth.com, which was presented as their website to anyone who began asking questions. Another, tryimmortelleyouth.com, is the website on which consumers actually sign up for a free trial. That site is loaded with false representations, contains no terms of service whatsoever, and makes no disclosure that the victims will be charged for ongoing subscriptions. Both domains were registered on December 12, 2018 by NameCheap within one second of one another, indicating that they are operated by the same person or entity.

28.     Ultimately, Chase Bank fell for the Defendants' deception and refused a chargeback to Mrs. Cummings. She was forced to pay the costs of subscriptions which she never agreed to, from Defendants who lied to her, made the process to cancel as difficult as possible, and then lied to her bank by presenting them with a completely different website from the one she actually visited.

**The Immortelle Youth Scam**

29.     The "sales funnel" for Immortelle Youth—the series of websites which leads a customer through to a purchase—is typical of the free trial scams that both the Federal Trade Commission and Better Business Bureau have issued repeated warnings to consumers about.

30.     The customer initially encounters an advertisement for the product on a third-party site. In the case of Mrs. Cummings, she first found out about Immortelle Youth from a now-deleted Facebook advertisement which took her to a web page claiming that the product had been endorsed by Shark Tank.

31.    While this page appears to have been deleted from public view, an angry victim of the fraudulent scheme posted a Youtube video which demonstrates what the experience of purchasing Immortelle Youth was like for the typical customer.[1] In the video, the victim shows from start to finish the process of signing up for the "free trial." On information and belief, this process was typical of customers and was what Mrs. Cummings experienced.

32.    First, the customer sees a web site which is run either by an "affiliate" compensated for referrals or by the creator of the product themselves. The website in this instance was eonline.article-news.online, a site designed to mimic the format of a legitimate news article. This website was registered on November 27, 2018 via NameCheap, just a few weeks before the other two sites. The article was titled "Meghan Markle's Wedding Bombshell... Royal Family Furious!" *Id.*



33.    Notably, the URL for this page purports to be from "eonline"—a misleading effort to convince customers that this is a legitimate news article associated with the well-known gossip site, E! Online.

---

[1] "Fraudulent Immortelle Youth Company," https://www.youtube.com/watch?v=R5qvQkWBA4o (last visited Sept. 4, 2019).

34.    The "bombshell" described in the fake article is that Meghan Markle, an actress and now a famous member of the British royal family, has endorsed Immortelle Youth and is offering it as her line of skin care products. *Id.*



35.    Just as Mrs. Cummings recalls from her own experience, the page claims that Meghan Markle has "signed a deal with Shark Tank's Lori Greiner. The deal states that Meghan's New Cosmetics Line will be picked up and promoted by the American shopping channel QVC." *Id.*

36.    After a lengthy and completely fabricated story about Meghan Markle's travails with the royal family and the controversy that was supposedly generated by a member of the royal family being so crass as to launch a skin care line, the fake news article purports to reveal the name of Meghan Markle's new product: Immortelle Skin. The reason for the difference in names is unclear, but this website links to a purchase page for Immortelle Youth. The reference to "skin" may be related to the Defendants also marketing a product called Immortelle Allure Eye Serum, which they also shipped to Mrs. Cummings.



37.    The fake news article claims that Meghan Markle's "mystery line" has been discovered: "The company is called Immortelle Skin and it is a cutting-edge Wrinkle Reducer and Anti-Aging Serum. Her product line is becoming so popular, even top beauty experts such as Bethany Mota and Michelle Phan are singing Immortelle Skin's praises." *Id.*

38.    The fake article then includes a variety of faked quotes from other celebrities who have supposedly endorsed Immortelle Youth/Skin, bragging that "Countless aging celebs admit they avoided surgery and look 10 years younger using Immortelle Skin." *Id.*

39.    The fake article includes fake endorsement quotes from a variety of celebrities. For example, Kathie Lee Gifford purportedly used the product for two weeks and looked years younger.



40.    Not content to fake a review from a single member of the royal family, the Defendants also claim that Kate Middleton endorsed the product. Other claimed endorsements include actress Emma Thompson, co-host of the Today Show Hoda Kotb, and actress Helen Mirren. None of these endorsements are real—the Defendants simply made them up.

41.    After this fake news story and fake celebrity endorsements, the Defendants proceed to offer victims a fake free trial:



42.     The website claims that Immortelle Skin is "selling out around the world," a false representation of limited supply. The site continues that: "Because of the high demand of Immortelle Skin, Meghan can only offer a limited amount of free samples so you'll need to act quickly to take advantage of this amazing offer."

43.     It further falsely claims that Meghan Markle herself is offering the "free trial." And the site emphasizes that the "free sample" it is offering is "FREE!" and that "[t]he only thing you'll need to pay for is the discounted shipping rate, which is less than $6!" Later in the site, it describes the offer as a "Risk FREE Bottle of Immortelle Skin."

44.     After clicking a button to sign up for the trial offer, the user is redirected to an unknown landing page on the URL http://www.tryimmortelleyouth.com. An image of the landing page appears below:



45.    The landing page again repeats representations that there is a limited supply of the product and that there are "only 250 trials sent per day!"

46.    This landing page appears to be a version of a commonly used template by free trial scammers which is featured in the BBB study, ex. 1 at 7—the Immortelle Youth landing page uses an identical photo and even identical language to other scammers, but substitutes the image of a different product:



47.    Plaintiff does not know at this time whether this similar webpage indicates that the Defendants here were involved in perpetrating the other scams identified in the

Better Business Bureau study or whether they copied the website code from another scammer. Both are common practices: as the Better Business Bureau study notes: "Some companies may offer the same product under a variety of different names and change the web pages continuously. Fake news or other landing pages may only appear at a particular web address for a couple of days. This makes it harder for victims, law enforcement and credit card companies to find out what is really happening." Ex. 1 at 11. It is entirely possible that one or more of the Defendants here have sold this product under different names or on different webpages, and Plaintiff intends to seek this information in discovery.

48.    Further down on the page, the landing page represents that there has been a scientific study showing that the product can improve skin tone, reduce the look of uneven and sagging skin, and firm skin structure. On information and belief, there is no such study or scientific support for the claims that appear on this landing page.



49.     In the video, the victim of the Immortelle Youth scam demonstrates the process of signing up for the "free trial" of the product through the website.[2] Nowhere was she required to agree to any sort of terms of service. After clicking to sign up for the "free trial," the victim was sent to a page that informs users that they will "just pay a small shipping fee." It repeats the representations that there is a limited supply of the product: "Current Availability: LOW STOCK. Sell-out Risk: HIGH." *Id.* The total purchase price listed is $4.83 for shipping and handling. *Id.*

50.     Nowhere on the websites are there any disclosures that the "free trial" will in fact cost money, or that there will be further shipments after the initial sample, or that there will be any charges to the victim's credit card other than the initial $4.83 charge for shipping and handling. In fact, from the video, it does not appear that there is **any** link to a terms of service or any other agreement visible to consumers on the Immortelle Youth website.

51.     Just as an old-time speakeasy would maintain a false front of a legitimate business operation to distract law enforcement from their criminal activities, the Defendants here also run another website whose sole purpose appears to be to trick anyone conducting an investigation into the validity of these purchases (such as a bank or credit card company deciding whether to grant a chargeback to a consumer who complains).

52.     This "false front" website is immortelleyouth.com, a site featuring the product which appears legitimate. Unlike the website consumers actually see when they sign up for the free trial, this site contains a prominent terms of service, requiring that a box be checked to purchase the product. And unlike the website shown to consumers, this "false front" contains none of the representations of limited supply, scientific studies, miraculous results, or endorsement by the British royal family. Instead the website contains nothing but bland fluff and statements about its efficacy couched in the language

---

[2] "Fraudulent Immortelle Youth Company," https://www.youtube.com/watch?v=R5qvQkWBA4o (last visited Sept. 4, 2019).

of "may" and "might." In all respects, it is designed to look like a legitimate company and not a scam.

53.    The maintenance of this false front website is itself an act of deception, intended not just to hide from law enforcement but to prevent consumers from exercising their lawful right to a chargeback by their bank or credit card company for charges they never agreed to. Mrs. Cummings was herself a victim of this act of fraud: when she realized she was being charged without permission, she could not find the original website she viewed and was unable to convince Chase Bank that she had not actually agreed to these charges. Presented only with the false front, banks and credit card companies cannot know that there is criminal fraud being conducted behind it.

54.    The Federal Trade Commission has recognized this tactic as a common one used by this kind of scammer: "The defendants sometimes hosted multiple versions of the same promotion. If consumers navigated from an embedded link on another site – the much more likely way people would learn about a product – they were taken to pages where products were offered for sale with what the FTC says were undisclosed automatic shipment programs. But a funny thing happened if you just typed in the URL – for example, rippedmusclex.com. That took you to an entirely different site that included more visible disclosures of the trial offer. Why would a company create those different versions? The complaint suggests that it could have been done in an attempt to have a 'clean' version for banks, payment processors, and law enforcers."[3]

55.    Many other victims posted in response to the Youtube video reporting that they too had been scammed. [4] One victim stated "they charged my credit card 94 dollors!!!!!!!" (sic). Another stated "Stay away from this company. Huge SCAM!!"

---

[3] Leslie Fair, *Fauxmats, false claims, phony celebrity endorsements, and unauthorized charges*, Federal Trade Commission Business Blog (2017), https://www.ftc.gov/news-events/blogs/business-blog/2017/11/fauxmats-false-claims-phony-celebrity-endorsements (last visited Sept. 6, 2019).

[4] "Fraudulent Immortelle Youth Company," https://www.youtube.com/watch?v=R5qvQkWBA4o (last visited Sept. 4, 2019).

56.    Other victims explained in detail their experiences, which were similar or identical to that of Mrs. Cummings. One victim warned others that: "it's not real nothing about it its real my mother did this and they went into her account and stole almost $200 and never sent the product been arguing with people in the Philippines to make them give her money back it's a scam. They don't have a website or real address just a P.O. Box in Arizona somewhere. They target older women." *Id.*

57.    Another victim stated: "Omg this is exactly what happened to me. No where on that form did it say i had to cancel within 14 days and i was charged $93. I am furious and have been sending this company emails asking where my refund is. That's alot of money to steal from a person." *Id.*

58.    Another victim said: "I ordered 'free' trial on May 15, it arrived May 17 and I called to cancel on May 28 after reading these reviews.  The person that answered said the trial is 12 days because the 2 days shipping are included.  I told her I'm still within 14 days.  She then tried to get me to pay a discount of $43.  I responded no to everything and she finally gave me a RMA# to a P.O. Box in Arizona.  Said the cancellation is on hold until they receive the sample product back.  The operator could not pronounce Phoenix so not sure this is even a legit P.O. Box, plus what P.O. Box address accepts packages?! Will be sending back and watching my credit card closely." *Id.* A second victim replied: "i am experiencing the same thing and am returing the product after i said no to the discount (in my case was $23). did they not charge you anything after that??" *Id.*

59.    One victim said: "I just left my bank this morning Chase Manhattan in a dispute because this company when in to my account and took $200 without my knowledge and didn't send me anything it is clearly a scam and they are out of the Philippines. When I ordered they said the same thing as this video that it was Prince Harry's wife's product and this product is not connected in any way it was shipped from APO Box in Arizona they are not even a business when I looked up and check with the Better Business Bureau there are fraudulent please be aware do not buy anything from this company it's a scam." *Id.* In another reply this same victim made clear that her bank

was deceived in to believing this was a legitimate company, likely by the false front website: "No the bank said it was a trial and that i should have canceled the order. NO matter how i tried to PLEAD my case that it said sample. the bank still gave those PEOPLE $200 from my ACCOUNT." *Id.*

60.    The same victim later posted: "Chase BANK CLAIMS department now know it was a SCAM because of the number of people that called the bank all saying the same thing. AND YET CHASE BANK STILL TOOK MONEY OUT OF OUR ACCOUNT AND PAYED THESE CROOKS. YOU CAN NOT FIND THEIR ADD OR PRODUCT ANY WHERE ON THE INTERNETS. I HAVE LOOKED EVERY WHERE AND ITS AD IF THEY DISAPPEARED FROM THE FACE OF THE EARTH. IF YOU DONT CHANGE YOUR DEBIT OR CREDIT CARD NUMBER THEY WILL GO BACK INTO YOUR ACCOUNT EVERY MONTH. YOU HAVE TO GET A NEW DEBIT OR CREDIT CARD NUMBER TO STOP THESE CROOKS." *Id.*

61.    Several complaints were also made to the Better Business Bureau.[5] One complaint stated: "My account was charged from this company for almost $200 which I was not aware of This company advertised a $4 charge with a $5 shipping to try a product a total of $9 per product and 1 month later my account was charged $93.83 and $92.72 which my bank made me aware after they believed it was fraud I canceled my card immediately. I was never made aware of these charges and I never approved these charges. This company than sent my bank disclosure confirmation that I never received or saw. I have never used this company before and was unfamiliar with this company until the charges were made to my attention." *Id.*

62.    Another victim complained to the BBB: "This company is a scam ... they have a trial avaaialble and no fine print stating any charges or fees. after a month they will charge you around 200$! and will not refund you no matter what ... i have proof that

---

[5] Immortelle Youth Eternal Charm, Better Business Bureau website, https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/immortelle-youth-eternal-charm-0653-90355962/complaints (last visited Sept. 6, 2019).

there was nothing in the fine print and they still will not refund me they still owe me exactly 58.83 they stole off my card today !" *Id.*

63.    These victims experienced exactly what Mrs. Cummings did. And they may be only the tip of the iceberg. It is highly likely that the Defendants ship other near-identical products, simply replacing the name on the label when the "heat" of complaints gets to be too much. It is further likely that any affiliates involved were advertising many other products using identical webpages. And it is also likely that any fulfillment company involved specializes in this kind of fraud, is well aware that they are participating in it, and is intentionally assisting in defrauding customers using cookie-cutter versions of the scam.

### Misrepresentations Regarding Reviews and Endorsements

64.    Defendants have gone to great length to make sure that their websites are not visible to anyone investigating them, including by setting up a "false front" website, by changing the settings on their websites so they will not be crawled by third parties which might archive their contents, and by setting the main pages of the tryimmortelleyouth.com and eonline.article-news.online websites to appear as if the sites are dead and nothing is there, when in fact there are live landing pages accessible to consumers. The specific URL's of these pages are not currently known to Plaintiff, but on information and belief the pages are identical to the ones in the video excerpted herein.

65.    On information and belief, and based on the video excerpted herein, Mrs. Cummings' recollection, and reports from victims, the structure of the Defendants' sales funnels and websites is such that every customer who purchases a product from them will be exposed to and view the fake celebrity endorsements described herein. While Mrs. Cummings could not locate a copy of the page she viewed because the Facebook ad had been deleted by Defendants, she specifically recalls viewing a website stating that the product had been endorsed by Shark Tank and relied on that in signing up for the "free trial."

66.    These celebrity reviews are material to the Defendants' customers and their decision to purchase the products at issue. Because these individuals are well-known with well-guarded reputations, portraying reviews as coming from them misleads customers into believing that the Defendants are a credible, well-established company. Because these celebrities are generally beautiful with desirable appearances, the fake quotes suggesting that these celebrities obtained that appearance by using the Immortelle Youth products misleads customers as to the kinds of results they may expect from using the products.

### Misrepresentations and Omissions Regarding Free Trials

67.    Another way the Defendants deceive consumers on their websites is to suggest that they are signing up for a "free trial," when in fact they are not. The first page a victim would view is eonline.article-news.online, which expressly states that consumers are signing up for a free trial. The second page a victim would view is the sign-up page on tryimmortelleyouth.com, which describes the offer as a "trial," lists the price for the product as $0.00 with the customer only paying $4.83 for shipping and handling, and falsely represents that the customer will "just pay a small shipping fee."

68.    On information and belief and based on the sales funnel structure, every customer who purchased Immortelle Youth would have been exposed to these representations.

69.    The Defendants made material omissions regarding the "free trial" on their websites by omitting material information which they were under a duty to disclose relating to those trials. The Defendants failed to disclose to consumers who viewed the websites that the trial was not in fact free, and that they were signing up for a subscription not only for the Immortelle Youth skin product but for their eye product as well. None of the terms were disclosed to the victims.

70.    The Defendants were under a duty to disclose this information to Plaintiff and the Class Members because the Defendants had exclusive knowledge of material

facts not known to them, namely that the trials were not free and that there would be additional subscription charges.

71.    Plaintiff and the Class Members did not know this, and it was difficult to discover because that information was not located on the website they signed up for the trial from, because the tryimmortelleyouth.com website was designed to be inaccessible from its main page, and because the "false front" website was placed on an entirely separate URL which was not linked to from the page on which the victims signed up for the trial.

72.    The Defendants were under a duty to disclose this information to Plaintiff and the Class Members because the Defendants engaged in active concealment, and have engaged in affirmative acts of hiding, concealing, or covering up this matter. The Defendants made efforts to hide their websites from view as described above, to make the landing pages difficult to find, to delete their Facebook ads so customers could not find them again, and by creating the "false front" website to conceal from their victims and others the actual landing pages that the victims visited.

73.    The Defendants were further under a duty to Plaintiff and the Class members because they made partial representations—that the cost would be $0.00 and that all they would pay for was shipping and handling—but also suppressed, concealed, or did not disclose material facts that qualify those representations, namely that there would be an ongoing subscription, that it would include more products than the one the victims signed up for, and that it would be for nearly $200 per month in total.

74.    The Defendants knew, or by the exercise of reasonable care should have known, that their omissions were untrue and misleading, and deliberately made the aforementioned omissions in order to deceive reasonable consumers like Plaintiff and other Class Members. Those omissions could have been corrected by including the omitted information in proximity to the trial offer on the tryimmortelleyouth.com website and in any other places where references to a free or trial offer occurred.

75.    The Defendants' omissions regarding the subscription payments were material to consumers. A reasonable consumer would attach importance to the truth or falsity of these omissions in deciding whether to purchase the products because if consumers had known they were not signing up for a free trial or that the actual cost would be more than $200 per month if they did not cancel virtually immediately, they would not have agreed to the offer.

76.    Mrs. Cummings was damaged by these misrepresentations and omissions individually as described herein, and relied on them in that she would not have signed up for the offer had she been informed of its terms.

**Representations Regarding Limited Supply**

77.    Both the Defendants' websites include representations of limited supply, as described herein. But on information and belief, those purported limitations and the representations that the product was "selling out around the world" or that there were limitations on how many people could sign up for the product were false.

78.    These misrepresentations are designed to induce consumers to sign up for trials and to create a false sense of urgency. As a result of these misrepresentations, consumers purchase products they would not have or pay more for them than they otherwise would have, or they retain products for longer than they otherwise would have and are damaged by finding that they have been subjected to a subscription they did not agree to.

79.    The Defendants' misrepresentations regarding their limited supply are material to consumers. A reasonable consumer would attach importance to the truth or falsity of these misrepresentations in deciding whether to purchase the products because if they knew that the products were not limited in supply and could be purchased at any time, consumers would not feel the need to sign up for a "free trial" on impulse and under time pressure that did not exist based on these representations. Plaintiff and the Class members thus reasonably relied upon these representations in making their purchase decisions.

### **Misrepresentations and Omissions Regarding the "False Front" Website**

80.    The Defendants deceived consumers and others, including their banks and credit card companies, by maintaining a "false front" website at the URL immortelleyouth.com. This site was created intentionally to make it appear to outsiders that the victims of the scheme had been informed of their subscriptions and had consented to them.

81.    Plaintiff and the class were damaged by these misrepresentations and omissions. All members of the class were damaged because had the banks and credit card companies not been unlawfully deceived, the scheme would have been shut down and none of the Class members would have been billed. The Defendants further owed duties to all of the Class members to inform them that there was a "false front" website, and the failure to do so injured every member of the Class.

82.    The Defendants made material omissions regarding the "false front" website by omitting material information which they were under a duty to disclose relating to those sites. The Defendants failed to disclose to consumers who viewed the websites that there were two separate websites, that the Defendants planned to intentionally deceive the consumer's banks or credit card companies if they attempted a chargeback, and that they were not bound by any of the terms or other disclosures on the immortelleyouth.com website.

83.    The Defendants were under a duty to disclose this information to Plaintiff and the Class Members because the Defendants had exclusive knowledge of material facts not known to them, namely that there were two separate websites, one of which was being used as a "false front."

84.    Plaintiff and the Class Members did not know this, and it was difficult to discover because that information was not located on the website they signed up for the trial from, because the tryimmortelleyouth.com website was designed to be inaccessible from its main page, and because the "false front" website was placed on an entirely

separate URL which was not linked to from the page on which the victims signed up for the trial.

85.    The Defendants were under a duty to disclose this information to Plaintiff and the Class Members because the Defendants engaged in active concealment, and have engaged in affirmative acts of hiding, concealing, or covering up this matter. The Defendants made efforts to hide their websites from view as described above, to make the landing pages difficult to find, to delete their Facebook ads so customers could not find them again, and by creating the "false front" website to conceal from their victims and others the actual landing pages that the victims visited.

86.    The Defendants were further under a duty to Plaintiff and the Class members because they made partial representations to the banks and credit card companies—that they maintained the immortelleyouth.com website—but also suppressed, concealed, or did not disclose material facts that qualify those representations, namely that none of the consumers had actually signed up for the free trial there.

87.    The Defendants knew, or by the exercise of reasonable care should have known, that their omissions were untrue and misleading, and deliberately made the aforementioned omissions in order to deceive reasonable consumers like Plaintiff and other Class Members. Those omissions could have been corrected by including the omitted information in proximity to the trial offer on the tryimmortelleyouth.com website, or in follow-up e-mails to their victims, or in proximity to their representations to banks and credit card companies.

88.    The Defendants' omissions regarding the "false front" website were material to consumers. A reasonable consumer would attach importance to the truth or falsity of these omissions in deciding whether to purchase the products because if consumers had known that the Defendants were maintaining a fake website for the purpose of defrauding their banks and credit card companies, they would not have signed up for the "free trial."

89.     Mrs. Cummings was damaged by these misrepresentations and omissions individually as described herein, and relied on them in that she would not have signed up for the offer had she been informed of this information.

## CLASS ACTION ALLEGATIONS

90.     Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

91.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. Rule 23, seeking certification of Plaintiff's claims and certain issues in this action on the Class, consisting of:

> **Nationwide Class:** All consumers in the United States who, within the applicable statute of limitations period until the date notice is disseminated, were billed for the Immortelle Youth Products.

92.     In the alternative, Plaintiffs seek certification of the following class:

> **California Class:** All consumers in the United States who, within the applicable statute of limitations period until the date notice is disseminated, were billed for the Immortelle Youth Products.

93.     "Immortelle Youth Products" means Immortelle Youth skin cream or eye serum, or Immortelle Allure skin cream or eye serum. Plaintiff expects that this definition will be modified in discovery as information is obtained from the John Doe Defendants. In particular, Plaintiff expects that there may be other products sold by the same Defendants with the exact same formulation, similar or identical injuries, but different labels or names. Plaintiff further expects that the conduct of the affiliates, the fulfillment companies, or the "crooked processors" may be subject to a different and much broader class that encompasses identical injuries that go beyond this specific product line.

94.    Excluded from the Class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

95.    Plaintiff reserves the right to amend or modify the class descriptions by making it more specific or dividing the class members into subclasses or limiting the issues.

96.    NUMEROSITY: Plaintiff is informed and believe, and on that basis allege, that the Plaintiff Class is so numerous that individual joinder of all members would be impracticable. Based on the BBB study, it is apparent that the number of consumers of injured by similar or identical Products by the John Doe fulfillment company or John Doe "crooked processor" would be so large as to make joinder impracticable as the Class (or Classes) would be comprised of thousands of consumers geographically dispersed throughout the United States. While the exact number of Class members is currently unknown, such information can be ascertained through appropriate discovery.

97.    COMMONALITY: Defendants' practices and omissions were applied uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class. All members of the putative Classes were and are similarly affected by having purchased and used the Products, and the relief sought herein is for the benefit of Plaintiff and members of the putative Class.

98.    PREDOMINANCE: Questions of law and fact common to the Class exist that predominate over questions affecting only individual members, including but not limited to:

a) whether Defendants' representations discussed above are misleading, or objectively reasonably likely to deceive;

b) whether Defendants' omissions discussed above involve facts the Defendants were obliged to disclose or facts contrary to representations by the Defendants;

c) whether the Defendants' owed consumers a duty to disclose the omitted material facts;

d) whether Defendants' alleged conduct is unlawful;

e) whether the alleged conduct constitutes violations of the laws asserted;

f) whether the Defendants' wrongful conduct was intentional or knowing;

g) whether the Defendants' wrongful conduct warrants punitive damages;

h) whether Defendants engaged in false or misleading advertising; and

i) whether Plaintiff and Class members are entitled to appropriate remedies, including restitution, damages, and injunctive relief.

99.    <u>TYPICALITY</u>: The claims asserted by Plaintiff in this action are typical of the claims of the members of the Class, as the claims arise from the same course of conduct by Defendants, all members of the Class have been similarly affected by Defendants' course of conduct, and the relief sought is common.

100.    <u>ADEQUACY</u>: Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has no interest adverse to the interests of the other Class members. Plaintiff has retained competent counsel with substantial experience in complex litigation and litigation involving scientific issues, who are committed to vigorously prosecuting this action on behalf of the Class.

101.    <u>SUPERIORITY</u>: A class action is superior to other available methods for the fair and efficient adjudication of the present controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that individual actions would engender. The benefits of proceeding as a class

action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, are far superior than any difficulties that might be argued with regard to the management of this class action. This superiority makes class litigation superior to any other method available for the fair and efficient adjudication of these claims. Absent a class action, it would be highly unlikely that the representative Plaintiff or any other members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed expected recovery.

102.   Certification of this class action is appropriate because the questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. Certification also is appropriate because Defendants acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate the relief sought on behalf of the Class as a whole. Further, given the large number of potentially injured consumers, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications. Certification of Plaintiff's claims for class-wide treatment is also appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

103.   Notice to the members of the Class may be accomplished inexpensively, efficiently, and in a manner best designed to protect the rights of all Class members. Class notice can likely be directly sent to individual members of the Class because Defendants' own records and documents will likely identify all members of the Class and contain their contact information.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violation of the Consumer Legal Remedies Act

### Cal. Civ. Code § 1750, *et seq.*

104.    Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

105.    Plaintiff brings this claim individually and on behalf of the Class.

106.    The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

107.    Defendants' false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase and use of Defendants' Product for personal, family, or household purposes by Plaintiff and Class Members, and violated and continue to violate the following sections of the CLRA:

a.    § 1770(a)(2): misrepresenting the source, sponsorship, approval, or certification of goods or services, in particular through the false celebrity endorsements and false presentation of websites as news articles described herein;

b.    § 1770(a)(3): misrepresenting the affiliation, connection, or association with, or certification by, another, in particular through the false celebrity endorsements and false presentation of websites as news articles described herein;

c.    § 1770(a)(5): representing that goods have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, in particular through the false celebrity endorsements, the false representations regarding test results, the "false front" website, the representations regarding limited supply, and the false presentation of websites as news articles described herein;

d.    § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another, in particular the false celebrity endorsements and false representations regarding test results as described herein;

e. § 1770(a)(9): advertising goods with intent not to sell them as advertised, in particular in representing that they would be sold for the cost of shipping and handling as part of a free trial when the Defendants in fact intended to sell them as part of an ongoing subscription;

f. § 1770(a)(13): making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions, in particular through the false story regarding Meghan Markle, the false representations of a "free trial," and the false representations regarding limited supply as described herein;

108. Defendants profited from their sales of the falsely, deceptively, and unlawfully advertised Product to unwary consumers.

109. Plaintiff and members of the Class purchased the Products for personal use, in reliance on Defendants' false and misleading material claims as described herein.

110. Pursuant to Cal. Civ. Code § 1780(d), Plaintiff has attached its affidavit of venue hereto as Exhibit 2.

111. As a result of Defendants' violations of the CLRA, Plaintiff and the Class have suffered irreparable harm and seek injunctive relief prohibiting further violations of the CLRA. Plaintiff and the Class also seek to recover their attorneys' fees and costs.

112. Mrs. Cummings has standing to seek injunctive relief because she may be injured by the Defendants' conduct in the future. The Defendants are likely cycling through product names and product types and may present other offers that result in fraudulent billing and which would be difficult to detect or identify as coming from them. The Defendants further have Mrs. Cummings' credit card and other personal information and could attempt to bill her in the future without her consent, just as they did in the past.

113. Under Cal. Civ. Code § 1782(d), a plaintiff may without prior notification file a complaint alleging violations of the CLRA that seeks injunctive relief only. If the plaintiff later sends a CLRA notification letter and the defendant does not remedy the

CLRA violations within 30 days of notification, the plaintiff may amend its CLRA causes of action without leave of court to add claims for damages.

114.   Plaintiff has filed this John Doe complaint, and presently does not know the identities of the Defendants. Pursuant to §1782 of the CLRA, Plaintiffs intend to notify the John Doe Defendants in writing of the particular violations of §1770 of the CLRA as soon as they can be identified and to demand that Defendants rectify the actions described above by providing complete monetary relief, agreeing to be bound by their legal obligations and to give notice to all affected customers of their intent to do so. Plaintiff will send this notice by certified mail, return receipt requested, to any John Doe Defendants' principal place of business, and will amend this complaint to include them.

115.   If Defendants fail to adequately respond to Plaintiff's demand within 30 days of the letter pursuant to §1782 of the CLRA, Plaintiff will then amend this claim to add additional claims for relief, including claims for compensatory and punitive damages.

**SECOND CAUSE OF ACTION**

**Violation of the California False Advertising Law**

**Cal. Bus. & Prof. Code §§ 17500, *et seq.***

116.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

117.   Plaintiff brings this claim individually and on behalf of the Class.

118.   Pursuant to California Business and Professions Code § 17500, *et seq.*, it is unlawful to engage in advertising "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . [or] to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised."

119.   Defendants have violated § 17500, *et seq.*, in particular as described herein through the false celebrity endorsements, the false representations regarding test results,

the "false front" website, the representations regarding limited supply, their efforts to make it difficult to cancel subscriptions, the "free trial" representations, and the false presentation of websites as news articles described herein.

120.   Pursuant to California Business and Professions Code § 17505, "No person shall state, in an advertisement of his goods, that he is a producer, manufacturer, processor, wholesaler, or importer, or that he owns or controls a factory or other source of supply of goods, when such is not the fact, and no person shall in any other manner misrepresent the character, extent, volume, or type of his business."

121.   Defendants have violated § 17505, in particular through their representations of limited supply, the "false front" website, the false celebrity endorsements, and the false presentation of websites as news articles described herein.

122.   Defendants misled consumers by making misrepresentations and untrue statements about their products as described herein.

123.   Defendants misled consumers by omitting material information which they were under a duty to disclose as described herein. Defendants were under a duty to disclose this material information to Plaintiff and the Class Members.

124.   Defendants knew, or by the exercise of reasonable care should have known, that their representations and omissions were untrue and misleading, and deliberately made the aforementioned representations and omissions in order to deceive reasonable consumers like Plaintiff and other Class Members. In particular and *inter alia*, this is evidenced by the outlandishness of the conduct described and of the story the Defendants concocted regarding Meghan Markle and Shark Tank, the significant publicity these illegal free trial schemes have received, prior FTC actions against similar enterprises, and the fact that the illegality of these activities is well known in the affiliate marketing industry.

125.   As a direct and proximate result of Defendants' misleading and false advertising, Plaintiff and the other Class Members have suffered injury in fact and have lost money or property, time, and attention. Plaintiff reasonably relied upon Defendants'

representations regarding their products. In reasonable reliance on Defendants' false representations, Plaintiff and other Class Members purchased the products at issue and paid more for those products than they would have had they been aware that Defendants' representations were false. Plaintiff and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore Plaintiff and other Class Members have suffered injury in fact.

126.   Defendant's representations were material to the decision of Plaintiffs and the Class Members to purchase Defendant's products, and a reasonable person would have attached importance to the truth or falsity of the representations made by Defendant in determining whether to purchase Defendant's products. The suggestion that the products were endorsed by Shark Tank was a factor in Mrs. Cummings' purchase and tended to lend credibility to the product, and a reasonable consumer who knew this was false would not have signed up for the "free trial." With respect to the omissions by Defendant as described herein, those omissions were material and Plaintiff and the Class Members would have behaved differently if the information had been disclosed. Had Defendants disclosed the omitted information, that there would be an ongoing subscription and not a one-time free sample with only a shipping and handling charge, Plaintiff and the Class Members would have been aware of it and would not have purchased the products from Defendant or would not have paid the same price for those products.

127.   Defendants advertised to Plaintiff and other Class Members, through written representations and omissions made by Defendants and their employees that the Immortelle products would be of a particular nature and quality.

128.   The misleading and false advertising described herein presents a continuing threat to Plaintiff and the Class Members in that Defendants persist and continue to engage in these practices, and will not cease doing so unless and until forced to do so by this Court. Defendants' conduct will continue to cause irreparable injury to consumers

unless enjoined or restrained. Plaintiff is entitled to injunctive relief ordering Defendants to cease their false advertising, and Plaintiff pleads in the alternative to any claims for remedies at law that Plaintiff and all Class Members are entitled to restitution of the entirety of the Defendants' revenues associated with their false advertising, or such portion of those revenues as the Court may find equitable.

**THIRD CAUSE OF ACTION**

**Violation of the Unfair and Fraudulent Prongs**

**of the California Unfair Competition Law**

**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

129.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

130.   Plaintiff brings this claim individually and on behalf of the Class under the "unfair" and "fraudulent" prongs of California's Unfair Competition Law, Business and Professions Code section 17200, et seq., on behalf of themselves and the Classes against Defendants.

131.   As alleged herein, Plaintiff has suffered injury in fact and lost money or property as a result of Defendants' conduct because Mrs. Cummings was autobilled without her permission, was charged on her credit card without permission, and was unable to convince her bank to refund the charges. She further did not receive the benefits promised by the Immortelle products, including a product endorsed by Shark Tank and other celebrities and a product with studies supporting its efficacy. Plaintiff suffered that injury at the time of purchase when Plaintiff bought products that do not deliver the benefits Defendants promise, as well as on the dates her credit card was billed without permission.

132.   The Unfair Competition Law, Business & Professions Code §17200, *et seq.* ("UCL") prohibits "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising

and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

133.    Defendants committed "unfair" business acts or practices by, among other things: (1) engaging in conduct where the utility of such conduct, if any, is outweighed by the gravity of the consequences to Plaintiffs and members of the Classes; (2) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs and members of the Classes; and (3) engaging in conduct that undermines or violates the spirit or intent of the consumer protection laws alleged in this Class Action Complaint.

134.    The utility of the conduct committed by Defendants and as described herein is nonexistent. There is no utility to falsely suggesting to customers that a product has been endorsed by celebrities, to falsely suggesting a customer is signing up for a free trial, to running a "false front" website to deceive banks and others, or to any of the other conduct by the Defendants. The harm to consumers caused by this conduct, by contrast, is significant. The Defendants' conduct described herein not only deprived the consumers of the value they were expecting to receive, it also caused them to treat health conditions with ineffective products rather than alternative options, deprived them of money, and interfered with their lawful efforts to convince their banks that a fraudulent transaction had occurred.

135.    Defendants' conduct as described in this Complaint offends established public policies. The Defendants' conduct violated numerous civil and criminal statutes, as described further herein and in detail in the Fourth Cause of Action. Those statutes exist for a reason: to protect consumers from unfair marketing practices, and in many cases to protect consumers' health. It is a particularly important public policy issue to avoid these kinds of violations in products that relate to health care or that are applied to the human body given the risks of such violations.

136.    Defendants' conduct as described in this Complaint is immoral, unethical, oppressive, and unscrupulous, as well as substantially injurious to Plaintiff and the Class.

In particular and *inter alia*, this is evidenced by the outlandishness of the conduct described and of the story the Defendants concocted regarding Meghan Markle and Shark Tank, the significant publicity these illegal free trial schemes have received, prior FTC actions against similar criminal enterprises, and the fact that the illegality of these activities is well known in the affiliate marketing industry, and by the widespread dishonesty present in the Defendants' marketing materials.

137.    Defendants' conduct as described in this Complaint violates the letter, spirit, and intent of the consumer protection laws. Their products amount to snake oil, marketed dishonestly and in violation of various consumer protection laws, as described herein and in the Causes of Action of this complaint.

138.    As detailed herein, Defendants' unfair and/or fraudulent practices include disseminating false and/or misleading representations, through their marketing and advertising.

139.    Defendants are aware that the claims or omissions they have made about the Products were and continue to be false and misleading.

140.    Defendants had an improper motive—profit before accurate marketing—in their practices related to their deceptive practices, as set forth herein.

141.    There were reasonably available alternatives to further Defendants' legitimate business interests other than the conduct described herein. For example, Defendants could have removed the false and misleading representations from their advertisements, provided omitted information the Plaintiffs to avoid any deception, and could have complied with the law rather than violating the statutes as described in Plaintiff's Fourth Cause of Action.

142.    As a direct and proximate result of Defendants' unfair or fraudulent business acts and practices and misleading and false advertising, Plaintiff and the other Class Members have suffered injury in fact and have lost money or property, time, and attention. Plaintiff reasonably relied upon Defendants' representations regarding their products. In reasonable reliance on Defendants' false representations, Plaintiff and other

Class Members purchased the products at issue and paid more for those products than they would have had they been aware that Defendants' representations were false. Plaintiff and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore Plaintiff and other Class Members have suffered injury in fact.

143.    Defendant's representations were material to the decision of Plaintiffs and the Class Members to purchase Defendant's products, and a reasonable person would have attached importance to the truth or falsity of the representations made by Defendant in determining whether to purchase Defendant's products, as described in detail herein. With respect to the omissions by Defendant as described herein, those omissions were material and Plaintiff and the Class Members would have behaved differently if the information had been disclosed. Had Defendants disclosed the omitted information, Plaintiff and the Class Members would have been aware of it and would not have purchased the products from Defendant or would not have paid the same price for those products. Similarly, had Defendants not engaged in the unfair and fraudulent business acts or practices described in this Complaint, Plaintiff and the Class Members would not have purchased the products from Defendant or would not have paid the same price for those products.

144.    As purchasers and consumers of Defendants' Products, and as members of the general public who purchased and used the Products and have suffered injury in fact and lost money and property as a result of this unfair competition and unlawful conduct, Plaintiff and the Class are entitled to and bring this class action seeking all available remedies under the UCL.

145.    The unfair and unlawful competitive practices described herein presents a continuing threat to Plaintiff and the Class Members in that Defendants persist and continue to engage in these practices, and will not cease doing so unless and until forced to do so by this Court. Defendants' conduct will continue to cause irreparable injury to

consumers unless enjoined or restrained. Under Business & Professions Code **§** 17203, Plaintiff is entitled to injunctive relief ordering Defendants to cease their unfair competitive practices, and Plaintiff pleads in the alternative to any claims for remedies at law that Plaintiff and all Class Members are entitled to restitution of the entirety of the Defendants' revenues associated with their unlawful acts and practices, or such portion of those revenues as the Court may find equitable.

## FOURTH CAUSE OF ACTION
### Violation of the Unlawful Prong
### of the California Unfair Competition Law
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

146.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

147.   Plaintiff brings this claim under the "unlawful" prong of California's Unfair Competition Law, Business and Professions Code section 17200, *et seq.*, individually and on behalf of the Class against the Defendants.

148.   The Unfair Competition Law, Business & Professions Code §17200, *et seq.* ("UCL") prohibits "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

149.   As detailed in Plaintiff's First Cause of Action, Defendants' acts and practices are unlawful because they violate the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*

150.   As detailed in Plaintiff's Second Cause of Action, the Defendants' acts and practices are unlawful because they violate the California False Advertising Law, Business & Professions Code §§ 17500, et seq.

151.   As detailed in Plaintiff's Third Cause of Action, the Defendants' acts and practices are unlawful because they violate the prongs of California's Unfair Competition Law,  Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which prohibit any "unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising...."

152.   As detailed in Plaintiff's Sixth Cause of Action, the Defendants' acts and practices are unlawful because they violate the California Automatic Renewal Law,  Cal. Bus. & Prof. Code §§ 17600, *et seq*.

153.   As detailed in Plaintiff's Sixth Cause of Action, the Defendants' acts and practices are unlawful because they violate the Electronic Funds Transfer Act,  15 U.S.C. § 1693e.

**Bank Fraud**

**In Violation Of**

**18 U.S. Code § 1344**

154.   The Defendants' conduct here is unlawful because they have committed bank fraud and conspired to commit multiple counts of bank fraud in violation of 18 U.S. Code § 1344.

155.   Pursuant to 18 U.S. Code § 1344, "[w]hoever knowingly executes, or attempts to execute, a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises" is in violation of the statute.

156.   Pursuant to 18 U.S. Code § 1349, "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

157.   The Defendants here conspired to commit bank fraud and to receive money obtained from bank fraud in violation of federal law.

158.   The money obtained by the Defendants through the tryimmortelleyouth.com website was obtained through credit or debit cards and was thus under the custody or control of financial institutions (in the case of Mrs. Cummings, Chase Bank). That money was obtained fraudulently. As described in this complaint, the Defendants intentionally used fake news stories and fake endorsements from celebrities, with the intent that Plaintiff and the Class rely upon them, in order to obtain their credit card numbers for the purpose of fraudulently billing them for subscriptions they did not agree to. The Defendants intentionally created a "false front" website for the purpose of defrauding banks and credit card companies into believing that customers consented to these subscriptions, when in fact the customers were not even informed of them. The Defendants intentionally failed to inform their victims that they were agreeing to any kind of subscription whatsoever. The Defendants knowingly conspired together to commit these violations and to benefit financially from this illegal scheme.

159.   Defendants' actions with respect to the products as described above are in violation of 18 U.S. Code § 1344 and thus constitute unlawful business acts or practices under the UCL.

**Wire Fraud**

**In Violation Of**

**18 U.S. Code § 1343**

160.   The Defendants' conduct here is unlawful because they have committed wire fraud and conspired to commit multiple counts of wire fraud in violation of 18 U.S. Code § 1343.

161.   Pursuant to 18 U.S. Code § 1343, "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice" is in violation of the statute.

162.   Pursuant to 18 U.S. Code § 1349, "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

163.   The Defendants here conspired to commit wire fraud and to receive money obtained from wire fraud in violation of federal law.

164.   The Defendants transmitted written communications by means of wire as part of their scheme to defraud, in particular through Facebook ads, their websites, through e-mail, through telephone communications to consumers which were intended to prevent them from exercising their lawful right to a chargeback, and through telephone or Internet communications to banks and credit card companies asserting that their subscription billings had been agreed to by customers or that their "false front" website was the site consumers visited.

165.   The money obtained by the Defendants through the tryimmortelleyouth.com website was obtained fraudulently. As described in this complaint, the Defendants intentionally used fake news stories and fake endorsements from celebrities, with the intent that Plaintiff and the Class rely upon them, in order to obtain their credit card numbers for the purpose of fraudulently billing them for subscriptions they did not agree to. The Defendants intentionally created a "false front" website for the purpose of defrauding banks and credit card companies into believing that customers consented to these subscriptions, when in fact the customers were not even informed of them. The Defendants intentionally failed to inform their victims that they were agreeing to any kind of subscription whatsoever. The Defendants knowingly conspired together to commit these violations and to benefit financially from this illegal scheme.

166.   Defendants' actions with respect to its products as described above are in violation of 18 U.S. Code § 1343 and thus constitute unlawful business acts or practices under the UCL.

**Mail Fraud**

**In Violation Of**

**18 U.S. Code § 1341**

167.    The Defendants' conduct here is unlawful because they have committed mail fraud and conspired to commit multiple counts of mail fraud in violation of 18 U.S. Code § 1341.

168.    Pursuant to 18 U.S. Code § 1341, "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing" is in violation of the statute.

169.    Pursuant to 18 U.S. Code § 1349, "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

170.    The Defendants here conspired to commit mail fraud and to receive money obtained from mail fraud in violation of federal law.

171.    The Defendants transmitted matter or things and took or received matter or things via the Postal Service or private or commercial interstate carriers as part of their scheme to defraud, in particular by accepting return packages from their Arizona P.O.

Box shipped across state lines from other states (including from the state of California), and by shipping unordered products through the mail system to victims of the scheme with the intent to fraudulently bill them for those unordered products.

172.    The money obtained by the Defendants through the tryimmortelleyouth.com website was obtained fraudulently. As described in this complaint, the Defendants intentionally used fake news stories and fake endorsements from celebrities, with the intent that Plaintiff and the Class rely upon them, in order to obtain their credit card numbers for the purpose of fraudulently billing them for subscriptions they did not agree to. The Defendants intentionally created a "false front" website for the purpose of defrauding banks and credit card companies into believing that customers consented to these subscriptions, when in fact the customers were not even informed of them. The Defendants intentionally failed to inform their victims that they were agreeing to any kind of subscription whatsoever. The Defendants knowingly conspired together to commit these violations and to benefit financially from this illegal scheme.

173.    Defendants' actions with respect to its products as described above are in violation of 18 U.S. Code § 1341 and thus constitute unlawful business acts or practices under the UCL.

### Unlawful Violations of Federal Trade Commission Regulations
### Concerning Use of Endorsements and Testimonials in Advertising
### 16 C.F.R. pt. 255, *et seq.*

174.    The Defendants' acts and practices are unlawful under the California UCL because they violate Federal regulations governing the use of endorsements and testimonials in advertising.

175.    Pursuant to 16 C.F.R. pt. 255.1(a), "an endorsement may not convey any express or implied representation that would be deceptive if made directly by the advertiser." Under 16 C.F.R. pt. 255(1)(c), "[a]dvertisers are subject to liability for false or unsubstantiated statements made through endorsements...."

176.   The term "endorsement" means "any advertising message (including verbal statements, demonstrations, or depictions of the name, signature, likeness or other identifying personal characteristics of an individual or the name or seal of an organization) that consumers are likely to believe reflects the opinions, beliefs, findings, or experiences of a party other than the sponsoring advertiser, even if the views expressed by that party are identical to those of the sponsoring advertiser."  16 C.F.R. pt. 255(b). "Endorsement" as used by the regulation means both endorsements and testimonials. *Id.* at 255(c).

177.   Endorsers include consumers who receive free products from advertisers through their marketing programs. 16 C.F.R. pt. 255, Example 8. Endorsers also include third party bloggers who are compensated in any way by advertisers, and advertisers are subject to liability for misleading or unsubstantiated representations made by paid endorsers on their websites. 16 C.F.R. pt. 255.1, Example 5.

178.   Under the regulations, advertisers have a duty to train endorsers and to monitor their statements, and to take necessary steps to halt continued publication of deceptive representations by endorsers: "In order to limit its potential liability, the advertiser should ensure that the advertising service provides guidance and training to its bloggers concerning the need to ensure that statements they make are truthful and substantiated. The advertiser should also monitor bloggers who are being paid to promote its products and take steps necessary to halt the continued publication of deceptive representations when they are discovered." 16 C.F.R. pt. 255.1, Example 5.

179.   Plaintiff incorporates by reference the Factual Allegations section of this Complaint.

180.   As that section describes, the Defendants faked various endorsements from celebrities and other third parties who in fact have no connection to the product, have not used it, and did not make the statements and endorsements the Defendants attributed to them.

181.   Under 16 C.F.R. pt. 255.2(c), "[a]dvertisements presenting endorsements by what are represented, directly or by implication, to be "actual consumers" should utilize actual consumers in both the audio and video, or clearly and conspicuously disclose that the persons in such advertisements are not actual consumers of the advertised product."

182.   The Defendants falsely presented endorsements from celebrities as if those celebrities were actual consumers, including photographs of those purported celebrity consumers.

183.   Members of the Class were injured by this unlawful conduct and the violations of these regulations, in that Mrs. Cummings and the other class members would not have purchased the products but for the fake endorsements from celebrities which made the product seem credible.

184.   Defendants' actions with respect to its endorsers as described above are in violation of 16 C.F.R. pt. 255, *et seq.* and thus constitute unlawful business acts or practices under the UCL.

**Unlawful Violations of the**

**Sherman Food, Drug, & Cosmetic Law**

**Cal. Health & Safety Code, §§ 109875, *et seq.***

185.   The Defendants' acts and practices are unlawful under the California UCL because they violate the Sherman Food, Drug, & Cosmetic Law.

186.   The Defendants' products constitute cosmetics under the Sherman Food, Drug, & Cosmetic Law. Pursuant to Cal. Health & Safety Code § 109900, a "cosmetic" is "any article, or its components, intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to, the human body, or any part of the human body, for cleansing, beautifying, promoting attractiveness, or altering the appearance." The Defendants' products are cosmetics under this definition because they are applied to the human body in some form, and the products product sold by them are designed to beautify, promote the attractiveness of, or alter the appearance of skin.

187.   The Defendants' products also constitute drugs under the Sherman Food, Drug, & Cosmetic Law. Pursuant to Cal. Health & Safety Code § 109925, a "drug" includes "[a]n article used or intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in human beings or any other animal" and "[a]n article other than food, that is used or intended to affect the structure or any function of the body of human beings or any other animal." The Defendants' products are drugs under this definition because they are not food and because they are intended to affect the structure or function of skin, and claim to affect such structure or function.

188.   The Defendants' products also constitute new drugs under the Sherman Food, Drug, & Cosmetic Law. Pursuant to Cal. Health & Safety Code § 109980, a "new drug" includes "[a]ny drug the composition of which is such that the drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling or advertising thereof," or one that "has become so recognized, but that has not, otherwise than in the investigations, been used to a material extent or for a material time under the conditions." The Defendants' products are not generally recognized among experts as being safe and effective for the conditions they are advertised to treat. Their products use a blend of various ingredients, and it is that blend—the "composition"—which is at issue.

189.   The Defendants' representations as described in this Complaint constitute advertisements under the Sherman Food, Drug, & Cosmetic Law. Pursuant to Cal. Health & Safety Code § 109885, an "advertisement" means "any representations, including, but not limited to, statements upon the products, its packages, cartons, and any other container, disseminated in any manner or by any means, for the purpose of inducing, or that is likely to induce, directly or indirectly, the purchase or use of any food, drug, device, or cosmetic." The representations as described herein were likely to induce, directly or indirectly, the purchase of the Defendants' products, which constitute drugs and cosmetics, and they did in fact induce such purchases as described in this Complaint.

The representations were disseminated to the Plaintiffs and the Class using various means, including advertisements on Facebook and on the Defendants' websites.

190. Pursuant to Cal. Health & Safety Code § 110390, "[i]t is unlawful for any person to disseminate any false advertisement of any food, drug, device, or cosmetic. An advertisement is false if it is false or misleading in any particular."

191. Pursuant to Cal. Health & Safety Code § 110395, "[i]t is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food, drug, device, or cosmetic that is falsely advertised."

192. The Defendants violated Cal. Health & Safety Code § 110390 and § 110395 by disseminating false and misleading advertisements, as described in detail throughout this Complaint, and by selling, delivering, and offering for sale their products which were falsely advertised.

193. As stated above, Defendants' products are new drugs under the Sherman Food, Drug, & Cosmetic Law. *See* Cal. Health & Safety Code § 109980. New drugs are subject to specific approval requirements, and "[n]o person shall sell, deliver, or give away any new drug" unless the statutory requirements are satisfied. Cal. Health & Safety Code § 111550. One way to satisfy the requirements is that the product is a "new drug, and a new drug application has been approved for it and that approval has not been withdrawn, terminated, or suspended under Section 505 of the federal act (21 U.S.C. Sec. 355)." Cal. Health & Safety Code § 111550(a)(1). Another is that "[t]he department has approved a new drug or device application for that new drug or new device and that approval has not been withdrawn, terminated, or suspended." Cal. Health & Safety Code § 111550(b). The remaining methods are inapplicable to the Defendants' products, and on information and belief, Defendants have failed to satisfy the approval requirements for a new drug under the Sherman Food, Drug, & Cosmetic Law.

194. In addition to the various forms of harm alleged throughout this complaint, which Plaintiff incorporates here by reference, this particular violation specifically harmed Plaintiff and the Class by depriving them of the important and valuable

protections of this statutory scheme, by causing them to purchase products whose efficacy and safety had not been verified, and by causing them to purchase the products at issue and pay more for those products than they were worth in the absence of statutory compliance.

195.   Defendants' actions with respect to its products as described above are in violation of Cal. Health & Safety Code, §§ 109875, *et seq*. and thus constitute unlawful business acts or practices under the UCL.

## Unlawful Violations of the
## Federal Trade Commission Act
## 15 U.S.C. § 41, *et seq.*

196.   Pursuant to 15 U.S.C. § 45(a)(1), "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."

197.   Pursuant to 15 U.S.C. § 52(a), "[i]t shall be unlawful for any person, partnership, or corporation to disseminate, or cause to be disseminated, any false advertisement—(1) By United States mails, or in or having an effect upon commerce, by any means, for the purpose of inducing, or which is likely to induce, directly or indirectly the purchase of food, drugs, devices, services, or cosmetics; or (2) By any means, for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase in or having an effect upon commerce, of food, drugs, devices, services, or cosmetics."

198.   Defendant's products are both drugs and cosmetics.

199.   As described throughout this Complaint and in the First, Second, and Third Causes of Action, Defendants engaged in unfair methods of competition in or affecting commerce, as well as unfair or deceptive acts or practices in or affecting commerce. The act of selling their products online satisfies the requirement of "in or affecting commerce."

200.   As described throughout this Complaint and in the First, Second, and Third Causes of Action, Defendants disseminated false advertisements online and sold their

products online, which satisfies the requirement of "in or affecting commerce." Those advertisements were intended to induce and did in fact induce the purchase of Defendants' products.

201.   Defendants' actions with respect to its products as described above are in violation of the Federal Trade Commission Act, 15 U.S.C. § 41, *et seq*. and thus constitute unlawful business acts or practices under the UCL.

### Unlawful Violations of Federal Trade Commission Regulations
### Concerning Use of the Word "Free" and Other Similar Representations
### 16 C.F.R. pt. 251, *et seq.*

202.   Defendants' acts and practices are unlawful under the California UCL because they violate Federal regulations governing the use of the word "free" and other similar representations in advertising.

203.   Pursuant to 16 C.F.R. pt. 251.1(a)(2), "[b]ecause the purchasing public continually searches for the best buy, and regards the offer of 'Free' merchandise or service to be a special bargain, all such offers must be made with extreme care so as to avoid any possibility that consumers will be misled or deceived."

204.   "[A] purchaser has a right to believe that the merchant will not directly and immediately recover, in whole or in part, the cost of the free merchandise or service by marking up the price of the article which must be purchased, by the substitution of inferior merchandise or service, or otherwise." 16 C.F.R. pt. 251.1(b).

205.   Because of this right, Federal regulations strictly limit the duration of any 'free' offers in any given trade area: "So that a 'Free' offer will be special and meaningful, a single size of a product or a single kind of service should not be advertised with a 'Free' offer in a trade area for more than 6 months in any 12-month period. At least 30 days should elapse before another such offer is promoted in the same trade area. No more than three such offers should be made in the same area in any 12-month period. In such period, the offeror's sale in that area of the product in the size promoted with a

---

'Free' offer should not exceed 50 percent of the total volume of his sales of the product, in the same size, in the area."

206.  On information and belief, Defendants advertised their false "free trial" for more than six months (from December 2018 through at least September 2019).

207.  Offers labeled as "free" must comply with strict Federal disclosure regulations: "When making 'Free' or similar offers all the terms, conditions and obligations upon which receipt and retention of the 'Free' item are contingent should be set forth clearly and conspicuously at the outset of the offer so as to leave no reasonable probability that the terms of the offer might be misunderstood. Stated differently, all of the terms, conditions and obligations should appear in close conjunction with the offer of 'Free' merchandise or service. For example, disclosure of the terms of the offer set forth in a footnote of an advertisement to which reference is made by an asterisk or other symbol placed next to the offer, is not regarded as making disclosure at the outset." 16 C.F.R. pt. 251.1(c).

208.  Defendants failed to comply with these requirements to clearly and conspicuously disclose all terms, conditions, and obligations at the outset because on the tryimmortelleyouth.com website, the terms were not disclosed at all.

209.  Defendants' actions with respect to its use of the word "free" as described above are in violation of 16 C.F.R. pt. 251, *et seq.* and thus constitute unlawful business acts or practices under the UCL.

## Unlawful Violations of Federal Law Governing
## Negative Option Marketing On The Internet
## 15 U.S.C. § 8403, *et seq.*

210.  Pursuant to 16 C.F.R. § 310.2, "[n]egative option feature means, in an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."

211. Defendants utilize negative option features on their websites, offers, and agreements to sell their products because they purport to sign consumers up for a "free trial," and then interpret that as acceptance of a paid subscription if the consumer does not cancel shortly thereafter.

212. Pursuant to 15 U.S.C. § 8403, "[i]t shall be unlawful for any person to charge or attempt to charge any consumer for any goods or services sold in a transaction effected on the Internet through a negative option feature (as defined in the Federal Trade Commission's Telemarketing Sales Rule in part 310 of title 16, Code of Federal Regulations), unless the person—(1) provides text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (2) obtains a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction; and (3) provides simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account."

213. Defendants failed to follow any of these requirements, and in fact made no disclosure whatsoever of the negative option plan to their victims.

214. Defendants' actions with respect to its products as described above are in violation of Federal law governing negative option marketing on the Internet, 15 U.S.C. § 8403, *et seq*. and thus constitute unlawful business acts or practices under the UCL.

**Injury from Defendants' Unlawful Actions**

215. To extend that the unlawful conduct described above was based on misrepresentations, deception, or omission, Defendants knew, or by the exercise of reasonable care should have known, that their representations and omissions were untrue and misleading, and deliberately made the aforementioned representations and omissions in order to deceive reasonable consumers like Plaintiff and other Class Members.

216. As a direct and proximate result of Defendants' unlawful conduct and unfair competition, Plaintiff and the other Class Members have suffered injury in fact and have

lost money or property, time, and attention. Plaintiff reasonably relied upon Defendants' representations regarding their products. In reasonable reliance on Defendants' false representations, and as a result of Defendants' unlawful conduct and unfair competition, Plaintiff and other Class Members purchased the products at issue and paid more for those products than they would have had they been aware that Defendants' representations were false or had the Defendants not engaged in the unlawful and unfair conduct described herein. Plaintiff and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore Plaintiff and other Class Members have suffered injury in fact.

217.   As purchasers and consumers of Defendants' Products, and as members of the general public who purchased and used the Products and have suffered injury in fact and lost money and property as a result of this unfair competition and unlawful conduct, Plaintiff and the Class are entitled to and bring this class action seeking all available remedies under the UCL.

218.   The unfair and unlawful competitive practices described herein present a continuing threat to Plaintiff and the Class Members in that Defendants persist and continue to engage in these practices, and will not cease doing so unless and until forced to do so by this Court. Defendants' conduct will continue to cause irreparable injury to consumers unless enjoined or restrained. Under Business & Professions Code **§** 17203, Plaintiff is entitled to injunctive relief ordering Defendants to cease their unfair competitive practices, and Plaintiff and all Class Members are entitled to restitution of the entirety of the Defendants' revenues associated with their unlawful acts and practices, or such portion of those revenues as the Court may find equitable.

## FIFTH CAUSE OF ACTION

## Negligent Misrepresentation

219.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

220.    Plaintiff brings this claim individually and on behalf of the Class.

221.    The Defendants made express misrepresentations to Plaintiff and the Class, as described throughout the Complaint, including the false celebrity endorsements, the false representations regarding test results, the "false front" website, the representations regarding limited supply, the "free trial" representations, and the false presentation of websites as news articles described herein.

222.    Defendants lacked reasonable grounds for believing those representations to be true.

223.    Defendants made those misrepresentations with the intent that Plaintiff and the Class rely upon them, in particular to induce them to purchase Defendants' products and to induce them to pay a higher price than they would have absent the misrepresentations. Plaintiff and the Class justifiably relied upon Defendants' representations because they were made to appear to have come from legitimate news sources.

224.    Defendant's representations were material to the decision of Plaintiffs and the Class Members to purchase Defendant's products, and a reasonable person would have attached importance to the truth or falsity of the representations made by Defendant in determining whether to purchase Defendant's products. Whether a celebrity endorses a product, whether the product supply is limited, and whether the product is free have a significant impact on a purchasing decision. Had Defendants not engaged in the misrepresentations described in this Complaint, Plaintiff and the Class Members would not have purchased the products from Defendant or would not have paid the same price for those products.

225.    As purchasers and consumers of Defendants' Products, and as members of the general public who purchased and used the Products and have suffered injury in fact and lost money and property as a result of these misrepresentations, Plaintiff and the Class are entitled to and bring this class action, and are entitled to damages and other legal or equitable remedies as a result.

## SIXTH CAUSE OF ACTION

### Violation of the California Automatic Renewal Law

### Cal. Bus. & Prof. Code §§ 17600, *et seq.*

226.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

227.   Plaintiff brings this claim individually and on behalf of the Class.

228.   Pursuant to California Business and Professions Code section 17600, *et seq.*, "[i]t is the intent of the Legislature to end the practice of ongoing charging of consumer credit or debit cards or third party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service."

229.   California Business and Professions Code section 17602 prohibits "any business that makes an automatic renewal or continuous service offer to a consumer in this state" from engaging in certain activities.

230.   Pursuant to California Business and Professions Code section 17602(a)(1), it is unlawful for such a business to "[f]ail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity… to the request for consent to the offer."

231.   Pursuant to California Business and Professions Code section 17602(a)(1), if an automatic renewal offer "also includes a free gift or trial, the offer shall include a clear and conspicuous explanation of the price that will be charged after the trial ends or the manner in which the subscription or purchasing agreement pricing will change upon conclusion of the trial."

232.   Pursuant to California Business and Professions Code section 17601(c), "'Clear and conspicuous' or 'clearly and conspicuously' means in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language."

233.    Pursuant to California Business and Professions Code section 17602(a)(2), it is unlawful for a business to "[c]harge the consumer's credit or debit card, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms, including the terms of an automatic renewal offer or continuous service offer that is made at a promotional or discounted price for a limited period of time."

234.    Pursuant to California Business and Professions Code section 17602(b), "[a] business that makes an automatic renewal offer or continuous service offer shall provide a toll-free telephone number, electronic mail address, a postal address if the seller directly bills the consumer, or it shall provide another cost-effective, timely, and easy-to-use mechanism for cancellation that shall be described in the acknowledgment specified in paragraph (3) of subdivision (a)."

235.    Pursuant to California Business and Professions Code section 17602(c), "a consumer who accepts an automatic renewal or continuous service offer online shall be allowed to terminate the automatic renewal or continuous service exclusively online, which may include a termination email formatted and provided by the business that a consumer can send to the business without additional information."

236.    Defendants violated the provisions of this statute, as described herein. They failed to inform consumers in any way whatsoever that they were signing up for an automatic renewal subscription, let inform them of the price or do it in a conspicuous manner. In fact, it was impossible for consumers to learn these terms on the tryimmortelleyouth.com website. The Defendants further violated the statute by making cancellation of the subscriptions as difficult as possible, including by failing to maintain their listed phone numbers, by failing to provide an easy method of cancellation, and by using their "false front" website to deceive customers and their banks into thinking there had been an agreement to a terms of service the victims were never exposed to.

237.   Plaintiff and the Class were injured by these violations because their bank accounts or credit cards were automatically billed without their permission and in violation of the statute. As a result, they lost money and were charged for products they never agreed to purchase.

238.   Plaintiff and the Class seek all available damages under this statute, including full refunds for any automatic billing and an injunction barring the Defendants from automatically billing any other customers of any product or automatically shipping any products to customers in the future absent compliance with the statute.

**SEVENTH CAUSE OF ACTION**

**Violation of 15 U.S.C. § 1693e**

**of the Electronic Fund Transfer Act**

239.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

240.   Plaintiff brings this claim on behalf of the Class.

241.   15 U.S.C. § 1693e(a) provides that a "preauthorized" electronic fund transfer from a consumer's account may be "authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made."

242.   15 U.S.C. § 1693a(10) provides that the term "preauthorized electronic fund transfer" means "an electronic fund transfer authorized in advance to recur at substantially regular intervals."

243.   Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b), provides that "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer. The person that obtains the authorization shall provide a copy to the consumer."

244.   Section 1005.10 of the Consumer Financial Protection Bureau's Official Staff Commentary to Regulation E, 12 C.F.R. § 1005.10(b), cmt. 5, Supp. I, provides that "[t]he authorization process should evidence the consumer's identity and assent to the authorization." The Official Staff Commentary to Regulation E further provides that

"[a]n authorization is valid if it is readily identifiable as such and the terms of the preauthorized transfer are clear and readily understandable." 12 C.F.R. § 1005.10(b), cmt. 6, Supp. I.

245.   On information and belief, Defendants debited consumers' bank accounts on a recurring basis without obtaining a written authorization signed or similarly authenticated writing from consumers for preauthorized electronic fund transfers from their accounts, thereby violating Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b).

246.   Further, on information and belief, Defendants debited consumers' bank accounts on a recurring basis without providing a copy of written authorization signed or similarly authenticated writing by the consumer for preauthorized electronic fund transfers from the consumer's account, or without providing clear and readily understandable terms of the preauthorized transfer, thereby violating Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b).

247.   Pursuant to 15 U.S.C. §1693m(a), Defendants are civilly liable to all injured victims of the class for these violations.

248.   Plaintiff and the Class seek all available damages under this statute, including full refunds for any automatic billing, an injunction barring the Defendants from automatically billing any other customers of any product or automatically shipping any products to customers in the future absent compliance with the statute, costs, reasonable attorney's fees, and statutory penalties.

## EIGHTH CAUSE OF ACTION

### Aiding and Abetting

249.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

250.   Plaintiff expects that there will be multiple John Doe Defendants ultimately discovered to have participated in this scheme, and based on the BBB report, that they

will be separate companies or individuals conspiring together. To the extent the tortious conduct alleged was not personally committed by them, the Defendants aided and abetted the tortious conduct alleged in this complaint by working together as a group to defraud consumers as described in the BBB report. Ex. 1.

251.   On information and belief, the Defendants knew that the tortious conduct alleged in this complaint constituted a breach of duties to Plaintiffs. The Defendants had actual knowledge of the wrongful conduct described herein. It is widely known among these scammers and among the various companies that provide them aid and assistance (the fulfillment companies and payment processing companies) that the Federal Trade Commission has branded these schemes illegal and is aggressively pursuing them.

252.   The Defendants gave substantial assistance or encouragement to the other Defendants in their actions by performing their roles as described in the BBB report (affiliate, website operator/product creator, fulfillment company, and "crooked processor" who helps evade fraud detection efforts by banks and credit card companies). Ex. 1.

253.   The Defendants participated in this conduct for personal gain or in furtherance of their own financial advantage.

254.   Each of the John Doe Defendants is thus jointly and severally liable for the conduct alleged herein by all of the others.

### NINTH CAUSE OF ACTION
### Civil Conspiracy

255.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

256.   The John Doe Defendants ("the Conspirators") formed a conspiracy to commit the tortious and unlawful conduct described herein.

257.   On information and belief, there was an agreement among the Conspirators to commit those wrongful acts and to cooperate in furtherance of the commission of those wrongful acts. This agreement is implied by the conduct of the conspirators because of

the common knowledge among these scammers that their conduct is illegal, because of their contracts with one another, because the fulfillment companies and "crooked processors" target this kind of scammer specifically to be their customers, and because of the nature of their close interaction as an economic unit.

258.   The John Doe Defendants were aware of the conduct of each other, and specifically of its unlawful nature. The John Doe Defendants agreed with one another that this conduct would be committed and intended that it be committed. It was in the John Doe Defendants' interests that this conduct be committed because they were specifically financially compensated for their participation. The John Doe Defendants acted in furtherance of their own financial gain as evidenced by this compensation.

259.   Plaintiff and the Class were harmed by the wrongful conducted committed by the Conspirators as part of the conspiracy, as described throughout this Complaint in the Causes of Action underlying the Conspiracy claim. As a direct and proximate result of the Conspirators' wrongful conduct, Plaintiff and the other Class Members have suffered injury in fact and have lost money or property, time, and attention. In reasonable reliance on the Conspirators' misrepresentations, Plaintiff and other Class Members purchased the products at issue and paid more for those products than they otherwise would have. In turn, Plaintiff and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore Plaintiff and other Class Members have suffered injury in fact. Defendant's representations were material to the decision of Plaintiffs and the Class Members to purchase Defendant's products, and a reasonable person would have attached importance to the truth or falsity of the representations made by Defendant in determining whether to purchase Defendant's products.

260.   Each of the Conspirators listed in this Cause of Action is thus jointly and severally liable for the conduct committed by the conspiracy.

## PRAYER FOR RELIEF

Wherefore, Plaintiff demands judgment as follows:

A.    An order declaring that this action may be maintained as a class action pursuant to Fed. R. Civ. Proc. 23, certifying this case as a class action, appointing Plaintiff as representative of the Class, and designating their attorneys as Class Counsel;

B.    Declaratory judgment that Defendant's actions are unfair and unlawful;

C.    An award of injunctive relief as permitted by law or equity including an order prohibiting Defendant from engaging in the unlawful and tortious acts described above, as well as prohibiting Defendants from charging any further subscription payments to members of the Class without first informing them of the misrepresentations and omissions, correcting them, and gaining affirmative consent to continue those subscriptions;

D.    A finding that such injunction constitutes public injunctive relief, has resulted in the enforcement of an important right affecting the public interest and otherwise meets the requirements of California Code of Civil Procedure § 1021.5, and an award of attorney's fees and costs pursuant to § 1021.5;

E.    For judgment for Plaintiff and the Class on their claims in an amount to be proven at trial, for economic, monetary, consequential, compensatory or statutory damages caused by Defendant's practices, along with punitive damages;

F.    In the alternative to any conflicting forms of relief, Plaintiff seeks restitution and/or other equitable relief, including without limitation disgorgement of all revenues, profits, and unjust enrichment that Defendant obtained from Plaintiff and the Class as a result of its unlawful, unfair, and deceptive business practices described herein;

G.    An award of attorney's fees and costs;

H.    For pre-judgment and post-judgment interest as provided for by law or allowed in equity; and

I.    Such other and further relief as is necessary and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. Proc. 38(b), Plaintiff demands a trial by jury on all issues so triable.

DATED: October 10, 2019

Respectfully submitted,

**KNEUPPER & COVEY, PC**

 /s/Kevin M. Kneupper

Kevin M. Kneupper, Esq.

*Attorneys for Plaintiff Stephanie Cummings and the putative Class*