# EXHIBIT 1



# Subscription Traps and Deceptive Free Trials Scam Millions with Misleading Ads and Fake Celebrity Endorsements

**BBB International Investigations Initiative**

BBB Chicago *bbbinfo@chicago.bbb.org*
BBB Dallas *info@nctx.bbb.org*
BBB Omaha *info@bbbinc.org*
BBB San Francisco *info@bbbemail.org*
BBB St. Louis *bbb@stlouisbbb.org*

C. Steven Baker *stbaker@bbbinc.org*

*Issued December 2018*



# Better Business Bureau®

## Introduction

You've seen them on the internet: ads or links leading to pictures of celebrities and products that sound intriguing. The ads claim these "miracle" products will help you lose weight easily, combat wrinkles or whiten teeth. Often, fraudulent operations involved with these types of ads employ the latest internet marketing techniques and professional looking websites.

You may be enticed to try these products through a "risk-free" trial. You might think they seem like a good deal. You only have to pay $1.95 for shipping and handling. The claims look plausible, and celebrities would not endorse a product unless they believed it works. There may be a risk that the product doesn't work as claimed, but it costs next to nothing to find out. Just enter your name, address and credit card number and act quickly; supplies are limited.

Better Business Bureau's (BBB's) in-depth investigative study found that many of these free trial offers are not free. They do not just send free product samples to try. If you can locate and read the fine print on the order page, or the terms and conditions buried by a link, you'll discover that you may have only 14 days to receive, evaluate and return the product to avoid being charged $100 or more. In addition, the same hidden information may state that by accepting the offer, you've also signed up for monthly shipments of the products. Those also will be charged to your credit card and become subscription traps. Many people find it difficult to contact the seller to stop recurring charges, halt shipments and get a refund.

The study found that many of the celebrity endorsements are fake. Dozens of celebrity names are used by these frauds without their knowledge or permission, ranging from Oprah Winfrey, Chrissy Teigen and Ellen Degeneres to Mike Rowe, Tim Allen and Sally Field. Sometimes the fine print even admits these endorsements are not real.

BBB receives complaints from free trial offer victims nearly every day and warns consumers to use extreme caution before agreeing to the offer and entering their credit card information. The chance of encountering this type of deception is high; they have infested the internet and social media. Solving this issue will require widespread education, law enforcement and work by credit card companies to recognize these types of fraudulent activities and deter access to the credit card system.





Losses in cases of this type pursued by the Federal Trade Commission (FTC) over the last ten years total more than $1.3 billion. Fraudsters have created a global multi-billion dollar industry.

Free trial offers can be legitimate ways to introduce new products. Credible companies make sure consumers understand what they are signing up for and do not hide key information.

Megan Olsen at the Council for Responsible Nutrition, the trade association for the major dietary supplement companies, says, "No legitimate company selling dietary supplements would engage in bogus free trial offers, trick people into subscriptions for continuing shipments, make outrageous unsupportable claims for products, or employ the names of celebrities without permission. In fact, we work with BBB to identify bogus product claims and encourage law enforcement action against deceptive practices."

The fraud involves a variety of players, from those who obtain the products to advertisers, shippers and credit card processors. But locating these operations can be elusive and identifying those behind them challenging.

This study shows the scope of the problem, describes the components that make fraudulent operations successful, discusses efforts to combat this deception and offers recommendations.



# Better Business Bureau®

## Scope of the problem

### How large is the fake free trial offer industry?

The problem is growing. **Available data from the FTC shows that complaints about "free trials" more than doubled between 2015 to 2017,** though not all people who complain actually lose money. Victims in 14 resolved FTC cases lost $1.3 billion. There may have have been more than a million victims just in those cases.

**BBB has identified 36,986 complaints and Scam Tracker Reports over the last three years**, though not all involve monetary loss. **Consumers reporting to BBB lost an average of $186.**

In addition, the FBI's Internet Crime Complaint Center *(IC3)* has seen an increase in complaints about free trial offers.

| IC3 | | |
|---|---|---|
| **Year** | **Complaints** | **Losses** |
| 2015 | 1738 | $5,709,227 |
| 2016 | 1927 | $3,884,439 |
| 2017 | 2486 | $5,669,170 |
| **Total** | **6151** | **$15,262,836** |

The **Canadian Anti-Fraud Centre** *(CAFC)* examined free trials and subscription traps in April of 2017. They only received 54 complaints from 2011 to 2016, but from March 2016 to March 2017 they received 518 complaints, an 859 percent increase. Of the 518 complainants, 474 lost money, with a total loss of $192,419 Canadian dollars *(approximately $146,812 U.S. dollars)* and an average loss of CA$248.

The CAFC also identified 371 company names engaged in free trial offers. The most common "gifts" or products ordered by victims were facial and wrinkle creams.

This is undoubtedly a worldwide problem. UK law enforcement says they get complaints but "don't have reliable numbers."

The Australian Competition and Consumer Commission *(ACCC)* has noticed a sharp increase in complaints about free trial offers and issued a **warning** about this type of fraud in September 2018. The ACCC says: "reports to Scamwatch increase[ed] 400 percent and losses increasing a staggering 3,800 per cent so far in 2018." The ACCC also warned that these regularly include supposed endorsements from celebrities.

These numbers most likely are low for several reasons. First, FTC studies have found that less than 10 percent of fraud victims report their losses to BBB or law enforcement. Second, many of these products are sold internationally, and victims in other countries are unlikely to file complaints in the U.S. or Canada. Complaint numbers are difficult to obtain because law enforcement does not yet categorize these types of complaints separately.



### Who are the victims of free trial offer frauds?

An examination of complaints and reports to BBB found that 72 percent were females and 28 percent were male. This may be because so many of these products are skin creams geared to that demographic. Other products may be directed to a male audience and some, such as diet pills, may affect a general audience. In addition, victims appear to span all income and education levels.

**Ages of victims:** The Internet Crime Complaint Center complaints are spread fairly evenly over age ranges, with a slight increase in ages 30-39.

| From 2015 - 2017 | | | | | | |
|---|---|---|---|---|---|---|
| **Under 20** | **20-29** | **30-39** | **40-49** | **50-59** | **60+** | **Not given** |
| 78 | 634 | 1303 | 1231 | 1056 | 1041 | 808 |

### Who is behind free trial offer frauds and where are they located?

The FTC's enforcement in this area strongly suggests that many of the free trial offer/subscription traps enterprises operate from the U.S. and Canada. FTC cases have all been against U.S. enterprises except Jesse Wilms, who ran his operation from Western Canada. Nevertheless, these may well use merchant processing accounts from overseas banks. The CAFC's study in April 2017 found 312 merchant accounts from banks in 14 countries. The most common location for banks behind the credit card processing were China, Latvia, Canada and the UK. These companies also sell extensively outside the U.S.; in one recent FTC case the defendants claim that 93 percent of their customers are in other countries.

# Better Business Bureau®

## How Free Trial Offer Frauds Work

An FTC case from 2010 may help illustrate how these free trial offer enterprises actually operate. The following contains the FTC's evidence and allegations made in court before the case ultimately settled:

**Central Coast Nutraceuticals** *(CCN)* sold a weight loss pill called AcaiPure, as well as a "colon cleansing" product dubbed Colopure. At the time, Acai berries were all the rage and were supposedly a miracle diet product. Acai berries grow on Acai palm trees in South America. CCN said its AcaiPure weight loss pills contained an extract of Acai berries.

CCN hired "affiliates" that placed ads at popular internet sites. Those who clicked on these links were first taken to "landing pages" that looked like independent news articles written by "reporters" who had supposedly investigated CCN's diet products and, to their surprise, found they produced amazing results. Readers were then provided with a link to click through to CCN's website. The affiliates were paid a commission from CCN when they got people to go to the website, or when they signed up for a free trial. The FTC separately **sued an affiliate network** that was using this tactic to get people to CCN's website.

CCN's website was well designed and very professional. It even had a "virtual spokesperson" in a video superimposed over the text who talked about the "benefits" of the products. In addition, CCN's site claimed that the products were endorsed by Rachel Ray and Oprah Winfrey.

The spokesperson claimed that the pills were "scientifically proven to help people lose up to five times their body fat, compared to a traditional diet and exercise program," and that they enable "rapid weight loss in a fiercely short time period, without any unwanted side effects, starvation, impossible to follow diet schemes or unnecessary fatigue." For its Colopure colon cleansing product, CCN listed dramatic information about the dangers of colon cancer and conveyed that its product would prevent colon cancer.

In addition, CCN claimed that people could get a free trial of these products for only a few dollars and see for themselves if they worked.

*Click here to download and view this short video of the speaking model and the website.*

**As CCN's video model said:**
"We stand behind Pure, and by doing so, we're not even going to ask you to pay for it. That's right. We'll send you a risk-free 30-day supply of our incredible AcaiPure, absolutely free of charge, so you can experience the amazing and incredible, fat-fighting power of AcaiPure first-hand without any risk. All we ask for is for you to pay a small shipping and handling fee of $4.95 and we'll rush it to you right away. So, be quick. With all the media attention surrounding AcaiPure, supplies are going fast and we can't guarantee this free 30-day supply will still be available next time you visit us."

**Consumer uses search engine or other high-volume site to find "Acai"**



**Search reveals an acai berry warning link placed and paid for by affiliate**

 

**Warning link takes consumer to a news site owned by the affiliate advertising their product**

 



 

**Convinced by the investigative report the consumer clicks the merchants link and purchases products**

**Merchant then pays the affiliate for each purchase through the link**



Customers were asked to provide their credit or debit card numbers to pay $4.95, or sometimes $1.95, for the "free" trial. Those who did were shipped a one month supply of the pills and were often charged $59.95 right away. And CCN would continue sending – and charging for – these pills every month.

These terms were only disclosed in very fine print if a customer scrolled down to the bottom of the order page where customers entered their credit card number. Another fine print statement said that by ordering, customers agreed to CCN's terms and conditions. You can see the fine print by going to the end of the video.

So how did the free trial actually work? Victims had to



# Better Business Bureau®





receive the pills and return them within 14 days to avoid being charged. Of course it took several days for the product to arrive, so it was really not possible for people to try the pills and see if they worked before they had to be sent back.

The invoice victims received explained that in order to return the product they had to call and get a Return Merchandise Authorization Number *(RMA)* from CCN. But often, CCN didn't answer its phone number, so those were difficult to obtain.

In addition, victims not only had to pay to ship the product back, they also had to do so in a form that provided proof that CCN actually received them, such as certified mail. Again, victims did not learn of this condition until after they had received the pills.

Many victims struggled to get a refund. And all the while CCN kept shipping more bottles of pills and charging customers credit cards.

But what about the pills? The FTC alleged the Acaipure and Colopure pills were nearly the same pill, though Colopure did not contain the acai berry extract. According to a medical expert assisting the FTC, there was no reason to think either product worked as claimed. He said AcaiPure simply had a laxative effect and none of the ingredients could produce the weight loss effects CCN claimed. He also said that, contrary to CCN's claims, there had been no scientific studies conducted on either acai berries or AcaiPure.

**The FTC noted that BBB received over 2800 complaints about CCN.** The National Advertising Division of BBB found CCN's claims about colon cleansing deceptive, and although CCN promised to end those claims, it instead changed the product name and continued to make the claims. Despite being sued by **Oprah Winfrey** for claiming she endorsed the product, CCN continued using testimonials for her. CCN settled another case over its free trial offer practices with the Arizona Attorney General's office but continued operating in violation of that court order.

**Victims lost at least $80 million to CCN.** The FTC sued the company in August 2010, and a federal court in Chicago froze its assets and appointed a receiver to take over operations. One and a half million dollars was recovered to refund to victims.

## Anatomy of the Fraud

*Several components must come together for the fraud to be effective. These usually include:*

**1. A product
2. Enticing advertising
3. A website
4. Celebrity endorsement
5. Product shipping
6. Payment processing
7. Customer service operations**

While these functions could be done from one office, a variety of players often work in tandem to make the deception effective.

### 1. The Product

To engage in a deceptive free trial offer there must be a product to sell. Over the last ten years these have mostly consisted of diet pills, teeth whiteners, wrinkle and anti-aging creams and, most recently, cannabis extract products.

Despite the fact that the pills are often sold for around $100 for a 30 day supply, the pills themselves are not necessarily costly. An online search for Acai berry pills found at least **one web site** offering pills in bulk at a cost of

# Better Business Bureau®

## Inside a Free Trial Scam



Consumer decides they would like to try the "FREE TRIAL".



They expect to pay $1.03 plus shipping.

When in actuality they are paying $94.31 for a trial pack and an auto monthly renewal subscription to Product A.



Consumer begins to complete checkout.

An additional $94.31 for a trial pack and monthly subscription to Product B is added to the total without the consumer's knowledge.



The total cost is $188.26 for the consumer trial packs and monthly subscriptions to Products A and B.

Much higher than the expected $1.03 plus shipping.

100 pills for three cents.

The claims made for the products sold through fraudulent free trials are often deceptive. **The FTC has issued a guide** for advertisers about weight loss claims that are basically never true, such as that a product "causes substantial weight loss no matter what or how much the consumer eats." Similarly, the FDA **has warned** that claims made for anti-aging creams or wrinkle removal are also unlikely to be true.

Some recent free trial offers include pills made from Cannabis extract with an ingredient called CBD. The FDA has again warned about claims made about CBD - particularly those that claim they can prevent or cure diseases.

The **FDA** in the U.S. and **Health Canada** both require that labels for dietary supplements list the ingredients they contain. Despite these requirements, how do you know that the products contain what they claim? **One FTC case** involved spam email selling male enhancement pills that were said to be "100% herbal and safe." In fact, the pills contained sildenafil (the active ingredient in Viagra) which can pose a health risk and requires a prescription. The company also claimed to sell generic versions of prescription drugs that were FDA approved. However, the pills, shipped from India, were not approved by the FDA and were sent without a required prescription. A recent article in **Scientific American** found that hundreds of dietary supplements actually contain prescription drugs.

**Advertising**. In order to get victims to decide to try a "free trial," these frauds often make extreme claims for the supposed merits of their products. In addition to claims that they are "miracle" products, medical breakthroughs or that new science proves that they work, deceptive claims are often conveyed in "testimonials" from supposedly happy customers or, as discussed below, endorsements by celebrities or other trusted figures.

**Substantiation.** Central to all consumer protection laws on advertising is the principle that claims for products must be truthful and substantiated. For some claims, absolute truth may be difficult to establish, and in those cases advertisers must be able to back up their claims with "substantiation." These are basic principles of advertising law supported by the FTC, the state attorneys general and BBB. Here is the **FTC policy statement on substantiation**. Under Canadian law, as well, companies must have adequate and proper testing to support their product claims. Some FTC free trial offer cases have challenged product claims while others have focused solely on the deceptive free trial marketing.

So what sort of substantiation, or support, must advertisers have before they make claims for their products? Testimonials from "happy" customers or popular articles will not suffice. Most claims about diet pills, wrinkle creams or other products sold as "free trials" are going to require some sort of clinical study or other scientific evidence. Needless to say, many of the "miracle" claims made for products sold through free trial offers lack any such support, and defendants in the FTC cases have made few attempts to justify the claims they make.



# Better Business Bureau®





## 2. Deceptive Affiliate Marketing

Many fraudsters offering fake free trials drive traffic to their websites by using display ads and sponsored content. In addition, **BBB** found that nearly 30 percent of victims encountered these ads on social media.

For example, the "one tip for a tiny belly" ad has been used to promote free trial offers. As described in a **Washington Post article**, the FTC found that it led users to a health-related fake free trial.

Many fake free trial offers use affiliate networks to advertise their products. Someone who wants to drive traffic to their website hires an affiliate network, which in turn hires individual affiliates to place advertising. The affiliates often buy space for ads or sponsored content on popular websites. Clicking on one of these ads will take people to a website where products are sold, or to a "landing page" that then refers users to the main site for the product. Commissions are paid to the affiliate network, which in turn pays the affiliates. Affiliates can either be paid per click or per order placed. Commissions for these misleading "free trial" offers can be **$30 to $50** for every person who signs up.

Often, deceitful advertisements for these offers use landing pages that are designed to look like consumer articles from reputable news sites. In one offer, the articles promoted Acai berry diet pills. The fake articles appeared to be from news websites, and were hosted on domains with names like "**channel5healthnews.com**; **dailyconsumeralerts.com**, and **online6health.com**." these websites often include falsified celebrity endorsements and fantastic claims about products. Some had the term "advertorial" at the top of the page, but the FTC alleged that this term did not reduce the deception. In addition, the comments supposedly posted by satisfied users at the bottom of the page were phony.

These articles included links to the domains where users could order "free trials" of the products.

In 2011, the **FTC sued ten different affiliates** who directed traffic to fake articles with deceptive ads.

**Emails.** Claims for bogus free trials may also come by email. Many people have received emails that appeared to be from an acquaintance, and contain only a link in the email body. These are sent by fraudsters, some of whom also work as deceitful affiliates. The links in the emails often take users to sites selling products with free trial offers. This is not a legitimate marketing technique; sending unsolicited email is a crime.

## 3. The web page

After clicking through from ads or landing pages by affiliates, victims arrive at the web page where they can get the free trial of the product. As noted in the following section, these may have pictures of celebrities that supposedly endorse the products. In some cases, they claim that a celebrity has left their job to launch a new skin care business, or that celebrities have invested their own money in the business.

The web pages appear professional. They often try to create a sense of urgency by claiming limited supplies are available. Sometimes, they also have "countdown clocks" indicating that the offer will expire shortly if the consumer does not act immediately.

Customers are required to enter their address and payment information. If any disclosures letting people know that they have only a short period of time to try the product and return it or be charged, or that additional



# Better Business Bureau®



supplies will be shipped monthly at a recurring cost, are on the landing page, they are often in very fine print and victims may have to scroll down to the bottom of the screen to encounter them.

These sites sometimes tell people that by entering their information they are agreeing to the terms and conditions which can only be seen if you click on a hyperlink and read pages of legalese. In some cases, people may be asked to check a box that they have read the terms and conditions. Most likely, people don't actually read the terms and conditions. As an April Fool's stunt, **one online game site** inserted a clause saying that by placing an order visitors were signing over their immortal soul. Very few people even noticed it.

It is illegal to offer a satisfaction guarantee, money back guarantee or free trial offer unless purchasers can get a full refund. Terms must be clearly disclosed. The FTC has **advertising guides**, compilations of rules developed through decades of law enforcement, that directly address free trial offers. The same provisions are contained in **BBB's Code of Advertising**. They state that claims of a satisfaction guarantee, money back guarantee or free trial offer mean to the public that they can get a full refund, for any reason, if they are unhappy with the purchase. Many free trial offer scams refuse to give refunds.

These guides also state that an ad mentioning a satisfaction guarantee or similar offer should inform consumers of any material conditions or limitations on the offer. For example, a restriction on the offer to a specific time period, such as 30 days, is a material condition that should be clearly disclosed. Failing to disclose terms adequately is deceptive and therefore, illegal.

It is also illegal to trap people into continued monthly billing without full disclosure in advance and a simple way to cancel. The U.S. has a specific statute addressing this situation. Adopted at the end of 2010, the **Restore Online Shoppers Confidence Act** (ROSCA) followed **FTC hearings on negative option issues** on the internet. It helps consumers avoid subscription traps. ROSCA addresses recurring billing, and not just for free trial offers.

# Better Business Bureau®



It also covers repeated billings for things such as health clubs, dating sites, book/magazine clubs, cooking or other products sold on television.

## There are three main ROSCA requirements.
**1.** Such offers must "clearly and conspicuously" disclose all material terms of the offer BEFORE getting a consumer's billing information. So what does clearly and conspicuous mean? It basically means something that people can easily see and understand. The FTC has provided **some guidance** on how to do this. Important information can't be hidden in a hyperlink to terms and conditions, in fine print, or in a footnote.
**2.** Companies must get a "consumer's express informed consent" before charging people. In other words, consumers must affirmatively agree to the program of regular charges and understand them.
**3.** There must be a "simple mechanism" for a consumer to "stop recurring charges." California has its own **law on auto renewals** which has similar requirements.

Canada does not have a law as specific as ROSCA, though general principles of consumer protection law should reach the same result. It is illegal to create the false or misleading general impression that consumers can try a product for free, only paying for the shipping costs, when in reality they will be charged the full price of the product if they don't call and cancel within a certain number of days. The truth about how these offers work is often buried in the difficult to read and understand terms and conditions, or fine print. The same terms and conditions will often state that the consumer has been signed up for a monthly subscription to the product.

The Competition Bureau, the Canadian agency that addresses false and misleading conduct in the marketplace, says that deceptive and misleading conduct in the digital marketplace is a priority and that they are actively examining claims made to the public that might raise issues under Canadian law.

## 4. Celebrity endorsements
One of the oldest tactics in advertising is to claim that a celebrity uses the product. Celebrities are often paid for endorsing legitimate products.

Another basic rule of advertising law is that the endorsement must be real. In the case of the free trial offers, often the fraudsters simply obtain pictures of celebrities and claim that they tried the product and endorse it. Several of the FTC's free trial offer cases have directly challenged the claims that celebrities have endorsed the products when they actually have not.

In some cases, the deceptive websites even have fine print admitting that the claimed endorsement is not real. For example, a website claiming that Joy Behar was leaving "The View" to set up her own line of skin-care products actually contained this **fine print disclaimer,** posted inconspicuously:

> "This website is not a source of facts or real information. All the content featured on our website is artificial and falls under the umbrella of fiction. … Any celebrities shown or mentioned on this page do not endorse this product." *(emphasis added)*

**One such website** is still live, claiming all five **Shark Tank** judges invested in a product, and that its product is used by celebrities. Fine print at the bottom states that it is all a fake. An internet search of one picture used shows the same picture being used for dozens of other products. **Similar claims** about people leaving to form their own skin care companies have used the names of **Joanna Gaines; Marc Zuckerberg's wife Priscilla Chan, Sean Hannity's wife Jill Rhodes**, and **Lara Spencer from Good Morning America**. Similar issues involve **celebrities in Canada**.

The Australian Consumer and Competition Commission issued a **warning** about the use of celebrities being used to endorse fake free trial offer products on September 24, 2018. They state that these fake offers have used the names

of: **Cate Blanchett; Deborah Knight** *(Nine News Sydney presenter);* **Delta Goodrem; Dr David Sinclair** *(Head of Ageing Lab UNSW);* **Dr Oz; Emma Thompson; Georgie Gardner** *(Today Show);* **Jessica Rowe** *(Studio 10)*; **Kyle Sandilands; Lisa Wilkinson** *(Ch 10);* **Mark Shuttleworth** *(BBC/CNN);* **Meghan Markle; Mikhail Varshavski** *(Dr Mike – US Celebrity);* **Nicole Kidman; Oprah; Sally Field** (American actress); **Sonia Kruger** *(The Voice, Today Extra);* and **Steve Baxter** *(Shark Tank).*

In addition, Clearwater, Florida BBB has received complaints about free trial offers that claim endorsements by: **Tim Allen; Christie Brinkley; Priscilla Chan; Chelsea Clinton; Ayesha Curry; Leonardo DiCaprio; Ellen DeGeneres; Christina El Moussa; Sally Field; Joanna Gaines; Kathy Lee Gifford; Lori Greiner; Dr. Steve Gundry; Mariska Hargitay; Laura Ingraham; Angelina Jolie; Mila Kunis; Ashton Kutcher; Matthew McConaughey; Marie Osmond; Victoria Osteen; Dr. Oz; Sarah Palin; Shark Tank; Pauley Perrette; Robertson family of Duck Dynasty; Kelly Ripa; Gwen Stefani; Martha Stewart; Chrissy Teigen; Ivanka Trump; Melania Trump; Vanna White; Oprah Winfrey; Giada De Laurentis; Good Morning America; and Facebook.**

Toronto Star, Canada's largest daily newspaper, recently published an **article** describing fake celebrity endorsements and subscription traps.



### 5. Product shipping

The free trial offer operations also have to get the product shipped to victims. Often, fraudulent free trial operations use fulfillment companies to ship the products and, presumably, accept returns.

One would think it would be easy to identify these companies. After all, postage has to be paid and most mail has a return address. And most products we receive contain an invoice from the seller. Because the web pages where victims place orders typically don't include physical addresses, the only address victims may have is the address of the fulfillment company. But those addresses may end up being post office boxes or mail boxes etc. and not the actual location of the warehouse.



For example, BBB in Clearwater, Florida identified a **fulfilment company** they have tied to 447 different products sold through deceptive free trials. They have received 2900 complaints about these products from 2017 to July 2018. **BBB** for Central Ontario has similarly **warned of fulfillment centers** in the Toronto area.

### 6. Payment Processing

**Credit and Debit cards.** For bogus free trial offers, the payment methods of choice are credit cards and debit cards. Victims that have paid by credit card should file a complaint at **bbb.org** and contact their card issuer using the phone number on the back of the card, and contest the charge, a process called a chargeback.





Unfortunately, credit card companies have often been reluctant to provide refunds to victims of free trial offers or subscription traps. The FTC cases regularly found that large numbers of people have been unable to chargeback successfully, and the same holds true for those who have complained to BBB. More than 1000 victims who had previously complained about deceptive free trial offers to BBB responded to a recent survey. Only 57 percent filed for a chargeback with their credit card company. Of those who did request a refund, 44 percent did not receive one and 14 percent got a partial refund. It may be necessary for credit card issuers to review their chargeback policies as they relate to questionable advertising tactics.

A **story on free trial offer scams** by the Canadian Broadcasting Company (CBC) in 2017 found that credit card companies were not authorizing chargebacks even when the reality of these situations was disclosed only in the terms and conditions. As noted above, legally these types of key terms must be disclosed clearly and where people can actually see and understand them.

In addition, the scams employ a variety of methods to try to evade credit card companies' anti-fraud policies.

The credit card companies and payment networks do not want to support fraudulent activity, and they regularly terminate merchant accounts of fraudulent operations when they detect them. In 2016 the Canadian Antifraud Centre *(CAFC)* began getting complaints from people who had large charges on their credit cards bills after visiting Costco's website. What they learned was that victims at the site were seeing pop-ups asking them to do a short survey. Because the survey mentioned Costco, victims believed that this was by, or authorized by, Costco, and when they saw a free trial offer for wrinkle creams they often used their credit card for a small "shipping and handling" charge. These victims then learned that they had fallen for a subscription trap.

The CAFC was able to identify 400 or so merchant accounts being used in this ploy and reached out to MasterCard and Visa. Because these sites were not affiliated with Costco, the merchant accounts were shut down.

So how does a credit card company know if a company accepting credit card transactions is a scam? As a first step, the company can review the application for a merchant account and inspect a company's website before letting them join the system. Additionally, credit card companies track chargeback requests; if chargebacks constitute over 1 percent of transactions from a given merchant, that raises red flags, more investigation or fines, and possibly termination.

Visa has rules that apply to merchants who accept their cards as payment. Merchants that accept Visa cards must ensure that customers have a fair chance to review all terms and conditions they are agreeing to before completing any transactions. These rules apply worldwide.

Specifically, merchants must properly disclose any refund or exchange policies to the cardholder at the time of the transaction. This also would include any terms about ongoing transactions if the cardholder fails to cancel within the given time frame. For example, for internet transactions, merchants must properly disclose terms on how to avoid charges for free trials or subscriptions for continuing shipments on their web pages before final checkout and include a "click to accept" button, checkbox or other acknowledgement. When these terms are not disclosed, Visa recommends that victims contact the bank that issued



**Credit Card Refund Requests and Results After Free Trial Fraud**

- ■ Didn't ask for refund — 57%
- ■ Didn't receive requested refund — 19%
- ■ Received partial refund — 14%
- ■ Received full refund — 10%




**Better Business Bureau**®



their credit card and ask for a chargeback to get their money back. Visa says that the burden of proof is on the merchant.

BBB efforts to reach MasterCard were unsuccessful. However, a story of these types of free trial offers by the Canadian Broadcasting Company in 2017 states: "MasterCard's customer service told a marketplace producer that consumers are responsible for finding any charges that may be listed in the terms and conditions, even if they're in "difficult places to see." American Express declined to comment on its practices, and Discover recommends that consumers dispute charges involving deceptive transactions.

Here are some ways fraudsters avoid detection by credit card companies.

**Using a crooked processor.** Banks that offer credit card processing hire Independent Sales Organizations *(ISO's)* to solicit and sign up merchants for them. The banks require that these agents comply with detailed rules before opening accounts to determine if they are legitimate and to monitor their activity for signs of fraud, such as reviewing chargeback rates and other suspicious activity.

But what if those providing processing services are in on the fraud? The FTC has **sued a number of these ISOs** over the years, often alleging that these third parties were aware of the fraud or actively assisted in helping a fraudulent company evade the rules of the credit card system. For example, in one FTC case an ISO spread the credit card charges over 26 merchant accounts to disguise the fraud activity.

**Getting many merchant accounts through shell companies.** Even without the aid of a dodgy intermediary, fraudsters can find ways to evade detection. A defendant in **another FTC case** employed 51 shell corporations to get merchant accounts and avoid detection and lied to banks on his merchant account application.

**Having "clean" websites.** It is illegal to bury key terms in fine print or other places where victims are unlikely to see them. In **another FTC case** the company had different versions of its websites. If consumers simply typed in the URL of its websites, a version appeared with prominent disclosures. But consumers that arrived at the website after clicking through from an affiliate site saw something very different and would not have seen the disclosures. This can also make it difficult for victims to show that they have been deceived if they later go to the websites after finding unexpected charges on their cards.

**Laundering.** What if the credit card charges pass through the account of a merchant that has lots of legitimate business? Doing this can keep overall chargeback rates down. This tactic is illegal under the FTC's Telemarketing Sales Rule.

**Changing product names and website addresses.** Some companies may offer the same product under a variety of different names and change the web pages continuously. Fake news or other landing pages may only appear at a particular web address for a couple of days. This makes it harder for victims, law enforcement and credit card companies to find out what is really happening.

**Using offshore banks to process.** In some cases, the fraudsters get merchant accounts through offshore banks. Those banks may permit more risky behavior in exchange for charging more for the processing.

So what is a consumer to do? Most of us don't keep screen shots of the web sites we visit. But if someone can find the site and take a screenshot, it may help with a chargeback request. And requesting a chargeback is important -- not only for getting money returned, but also by helping credit card companies identify fraudulent operators.

Debit cards may offer more protection against continuing shipments when money is drawn directly from a bank account. **Regulation E** implements the Electronic Fund Transfer Act in the U.S. and provides special protections. Under Section 10(e):

- First, no recurring debits can be made unless the consumer has provided a written authorization signed OR has similarly authenticated their agreement to be charged repeatedly. Electronic signatures are permitted, but those are also subject to other rules; just clicking a box will not be sufficient.
- Second, no authorization is valid unless the terms are "clear and readily understandable" AND they "should evidence the consumer's identity and assent to the authorization."
- Third, a copy of the authorization must be provided to the consumer. Victims should complain to their banks if they see such charges on their bank statements.

The FTC has charged violations of Regulation E in several of its cases.



**Better Business Bureau®**

### 7. Customer Service

Most free trial offer companies have telephone numbers to call, although many victims report to BBB that they have difficulty in getting a live person on the phone, and that many of those answering the calls can be quite rude. For the most part victims report that they are often able to stop future shipments and charges, but usually cannot get refunds for charges already made. At best victims are offered partial refunds.

Free trial offer frauds have an incentive to respond to complaints and discourage victims from going to their credit card company and seeking a chargeback, because more complaints to the credit card company can result in the loss of the merchant accounts needed to process credit cards.

## Victim Narratives

*Rose, a nurse from St. Louis,* reported seeing a social media ad on her phone for a skin cream product. It was sold by a company called Purely Organic Cosmetics, and the ad claimed that the product was endorsed by Shark Tank. Because it was just a few dollars to try the cream, and she said she believed Shark Tank was helping to market the product, she decided to give it a try.

Rose said she used a preloaded Visa card with $75 to pay $4.96 for shipping and handling on a free trial offer of the product. While online, she saw an offer for a second product for $2 shipping and handling, and also paid to try that product. She did not see an end date for the trial period, or that the company would continue to ship products. She thinks she may have clicked a box saying she agreed to terms and conditions, but is not sure.

When she told her family about the free trial product she received, they warned her that it could be a scam. Rose did an internet search for Purely Organic Cosmetics and found lots of complaints. She said she checked her credit card balance and found only $1.75 remaining.

After calling the company and waiting on hold for over an hour, she was told she could not get a refund, and that a third shipment of products was on the way. She said she was able to stop more shipments but could not get a refund for what she already paid.

When Rose called her credit card company to dispute the charges, she was told that the charges were in the terms and conditions, and that because she had accepted them, she could not get her money back. Her husband printed the terms and conditions, and did find information about continuing shipments.

Rose says she did try the lotion for a day or two, but didn't notice anything special and she threw the products away.

**Miracle Anti Aging Facial Rejuvenation Cream Nets Biggest Deal In Shark Tank History – See Why Sharks Jumped On This Wrinkle Remover**

Posted By: Rose Wanderer On December 10,2016





*Kim, from Marin County, California,* said when she saw an online ad for a free trial of a diet product called Extreme Fit 180, she was impressed because the ad claimed the product was endorsed by the entire cast of Shark Tank and they had all invested in it.

She said the cost was only $4.95 for shipping and handling, so it seemed worth a try. Before she could check out, she had to view a pop up page for an "Extreme Cleanse," which she was not interested in, and another for a green tea diet supplement. She thought that at the end she could view her cart and remove these if there was a charge because she did not want them. She says she did nothing to indicate that she wanted the other items.

After Kim submitted her order she said got an email alert that her credit card had been charged for the two items she did not want so she immediately called to cancel, and was told the items had already shipped and to just keep them.

Two weeks later, after Kim found a charge of $79 on her credit card from the diet product company, she called the company and left messages, but no one returned her call. The third time she reached a



> MAGNOLIA
>
> WACO, TEXAS | FRIDAY EVENING | APRIL 21, 2017
>
> # DON'T BELIEVE EVERYTHING YOU READ
>
> "People say believe half of what you see, son
> and none of what you hear
> But I can't help but be confused
> If it's true, please tell me dear"
> – Marvin Gaye

woman who was quite rude, telling her "Well, did you read the fine print? Your 14 day free trial is up and now you owe this." Kim explained that she had called immediately to cancel, and the operator told her notes showed that she had only cancelled the orders for the Extreme Cleanse and the Green Tea product. Kim said no, she had canceled everything and was going to complain to BBB. The operator said she would cancel her account, but would not refund her money.

After a quick internet search, she found complaints from other people that had the same experience. She called BBB and her bank to complain; the charges later were removed.

A box with the three products arrived, and she said she threw them away.

*Stacy, from Chicago*, reported that she saw an internet offer for a new skin care product, Luster Skin, from Joanna Gaines. It was a free trial, and customers only had to pay shipping and handling. She entered her address and credit card information but didn't think the order went through, so she went back to the site and in minutes the product had a different name. Stacy entered her information again and saw the same product being endorsed by Kate Middleton and Sally Field. She captured screenshots of some of the web pages that featured Sally Field.

She said she received two different products, a serum and an eye cream. She tried the products and concluded that they didn't work. Her credit card statements had small initial charges for the shipping and handling, and then two $95 charges for the products appeared two weeks later. One charge was from San Diego and the other was from Texas. She said she called the phone number on the invoice to cancel and was told that she only had 14 days to cancel, and she was calling on day 15. Stacy said she never saw disclosures that she had 14 days to cancel. After two more calls to the company, they refunded half of her money.

Stacy said that she would like to tell this company that they are lying crooks and to stop ripping people off.

*Julie works in HR in Omaha.* In 2017, she reported that she saw an article on Facebook about a UCLA student who discovered an excellent way to lose weight by using a product called Garcinia Cambogia. She thought it would be worthwhile to get a free sample by paying $4.95 for shipping, so she entered her credit card number. She saw no terms or conditions.

She tried the pills for a few days and said she didn't notice any results. She then received a second bottle of pills in the mail and thought it was a mistake, so she emailed the company and was told to call customer service. After spending 40 minutes explaining that she did not want more pills and wanted her money back, the operator told her that "you accepted the terms, and there is nothing we can do." They told her that the company could end her "membership" and stop shipping more, but she could not get her money back. She lost $184.

Julie went back to the web page where she had placed her order, and saw that the conditions of the trial and continuing shipments were mentioned in fine print on a gray background. She says she would never have provided her credit card information for the trial if she had seen the terms before purchasing.

She talked to a representative from her bank, who said there wasn't really anything she could do. She complained to BBB. She also found and joined a Facebook group with almost 1500 members called "STOP GARCINIA CAMBOGIA FREE TRIAL SCAM." She says that many of the experiences discussed in the group are very similar to hers.

Julie told BBB she wonders how the people at this company can sleep at night, and would like to tell them to quit stealing from people.

*Renee teaches fifth grade in Texas.* She stated that in December 2017, she saw an ad on Facebook stating that Joanna Gaines was promoting a new skin care line. She said she thought it was worth $5.95 to get a sample of an anti-aging skin cream product to see if she liked it. She looked to see if she was signing up for something unexpected and didn't see anything, so she entered her debit card to get the trial item.

# Better Business Bureau®

*The next day she saw charges on her bank statement for $109 and $103. She talked to her bank, which helped her call the company. Renee told the company that she had not authorized these charges and did not want the products. She was told that she would have to pay a $40 restocking fee to return the products, and would then get a refund in 7-10 days. Renee also went to the website of the company and saw that there were prominent disclosures about when the product had to be returned to avoid charges and that more would be shipped to her monthly. Renee said she felt certain that these disclosures were not on the ad she saw when she ordered.*

*She also reported that she found a blog by Johanna Gaines warning the public that she had not developed cosmetic products.*

*When Renee received the products, she shipped them back to the company by certified mail. She did not try the product because she said she felt the company was a scam. Despite calling the company several times, she has never received a refund. Her bank ensured that her card could not be charged again. She complained to BBB, but the company still did not give her money back.*

## Efforts to combat the fraud
### BBB's Role

Before doing business with any company it is a good idea to check them out with BBB. There are more than 100 BBBs across the U.S. and Canada, some also with regional offices, and all keep track of and list information online about businesses, not just ones that are "members" (known as Accredited Businesses). Visit **BBB.org** and enter the name of a company to learn more. Make sure to search nationwide, not just in your locality.

To be accredited, businesses must agree to comply with BBB Standards for Trust. Accredited businesses can use the BBB seal on their websites or in their advertising. But beware, there are companies out there that will use the BBB seal without permission. If any doubt exists, check the business out on the BBB.org website. Businesses that do not comply with BBB's standards are ejected from BBB. Accredited businesses must also agree to resolve complaints.

BBB also collects and tries to resolve complaints about businesses that are not accredited. BBB has seen thousands of complaints about misleading free trial offers.

The FTC regularly reaches out to BBB for copies of complaints or other data on companies it investigates. In its cases the FTC often says that dishonest companies only give refunds if consumers report them to BBB or a law enforcement agency.

In addition, BBB assigns businesses a letter grade, from A+ to F, based on complaint activity, regulatory actions and other factors reflecting the BBB's opinion of how the business is likely to interact with its customers. Consumers are encouraged to check out a company's rating before doing business and to report fraud.

BBBs have been able to tie many products and companies to fulfillment operations that ship products for different companies. In fact, one fulfillment company has shipped over 400 of these products for many of the businesses in this category.

In addition, each of the local BBBs has a person assigned to advertising review, and consumers can submit questionable ads for free trials or other issues to **BBB Ad Truth** for review.

**BBB** has issued warnings about free trial offers in **Ontario**; **Northeast Florida**; **North Carolina**, **North Alabama**; **Central Georgia**; **Montana**; **New York**; and **Delaware**. Many other **BBB** offices have worked with the media to warn about this type of fraud.

## Law Enforcement

Over the last ten years, the Federal Trade Commission has been very active in challenging bogus free trial offers. Many of these, but not all, have also included continuing monthly shipments and charges for products. The FTC has consistently **warned** consumers about this type of fraud. They even **produced a video** on this subject.

Products involved have included diet pills, tooth whiteners, offers of supposedly free government grants, colon cleansers and wrinkle creams. Most have involved advertising and sales exclusively over the internet, but one, Berkeley, also advertised extensively on television.

BBB has identified 16 cases of this type that the FTC has brought over the last ten years. In many of these cases, courts have entered injunctions, freezing assets of the companies and their owners and effectively putting them out of business.

Many of these cases have been settled; others won in court. One, Triangle, is still litigating and has been appealed.

Losses to victims can be calculated, even in a settlement, because the FTC usually gets a judgment for the full amount of losses, subtracting refunds from the company or refunds obtained from credit card companies, but suspends that judgment if defendants provide available remaining assets for the FTC to return to victims. Much of the money made by such operations is spent along the way so there is rarely enough money to provide full refunds to victims.

Total losses in 15 cases resolved to date total $1.3 billion. If average losses were $100 (and they could be higher), that would mean there could be 13 million victims involved in these cases. See a list and descriptions of the these cases at **bbb.org/stlouis/ftc-free-trial-offer-cases**

**State cases.** Several state attorneys general have filed civil actions jointly with the FTC. In addition, another case against free trial offers was filed by the Santa Monica, California District Attorney's office. **Beachbody** was a settlement announced in 2017. The company sold exercise videos, supplements and weight loss products. The order required a separate check box for auto renewals, and the company paid a $3.6 million fine.

**Criminal cases.** After the FTC has taken civil action, it may refer cases for criminal prosecution. **BBB** is aware of two cases so far where that has occurred. Steve Warshak,

Case 2:19-cv-08766-DMG-AGR   Document 14-1   Filed 03/31/20   Page 17 of 17   Page ID #:398



# Better Business Bureau®

owner of Berkely, was **convicted and sentenced** to ten years in prison. Jeremy Johnson, the owner of Iworks, was **sentenced to 11 years in prison** after appeal.

In addition, a recent **indictment** in federal court in Tennessee charged several businesses and individuals over a massive healthcare fraud. The criminal charges also contended that the same enterprise was advertising "free trial offers" for "millions of dollars" worth of products such as weight loss pills, skin creams, and testosterone supplements.

**What should you do if you believe you have been a victim of a free trial offer fraud? You have options:**
- Complain to the company directly.
- If that is not successful call the customer service number on the back of your credit card to complain to the bank.
- Complain to **www.bbb.org**
- Report the fraud to **www.bbb.org/scamtracker**
- Report it to the **Federal Trade Commission (FTC)** or call **877-FTC-Help**
- Report it to the **Internet Crime Complaint Center**, or IC3
- Report it to the **Canadian Anti-Fraud Centre**. Toll free from the US at **1-888-495-8501.**
- In Canada you can also complain directly to the **Competition Bureau**.
- Report suspicious, confusing or misleading ads to **BBB Ad Truth.**

## UPSELLS

**W**hen buying things over the phone or internet, consumers also are often offered additional products or services - a practice known as an "upsell." For example, someone may see an item advertised on television and call to place an order. After providing their credit or debit card number the company may offer to send an additional product, perhaps by just saying: "and today we are also going to send you a second product to try" with no mention of the price. Because the company already has your credit card number, they may simply ship the product and charge you for it.

Or, the company you reached out to may simply transfer you to another company and it does the upsell. If the company you originally contacted shares your credit card number with a second company, they may be able to charge you even if you don't know the full price and didn't intend to agree.

Congress has responded to widespread complaints about such upsells, and the ROSCA law addresses it. For internet transactions, any upsell by third parties must first disclose clearly and conspicuously all material terms of the transaction, a description of the goods or service being offered, and what the cost is. They also must get the full credit or debit card number from the consumer, their name, address and a means of contacting them.

For telephone upsells, such as when you call to buy something advertised on TV, the rules are a bit different. If during the call, you are offered a "free trial" of an additional product, companies must get at least the last four digits of the debit or credit card, and obtain your express informed consent. They must record and keep an audio recording of the entire sales call, not just the part where you agree to the charge.

If the telephone call does not involve a free trial offer the requirements are not as strict.

## Recommendations

- BBB urges credit card companies to do more to ensure victims receive chargebacks where key conditions are not adequately disclosed. Because this fraud is dependent on the use of credit cards, more effort is needed to identify and combat deceptive free trial offers employing credit card systems. Also, it would helpful if they could do more to educate their customers.
- Additional criminal prosecutions of this conduct are needed. The FTC and BBB have done much to address the issue, but do not have the ability to bring criminal charges. Only criminal prosecutions are likely to deter this type of fraud.
- Social media sites should do more to curtail such deceptive advertising.
- International cooperation is needed to combat this fraud. U.S. and Canadian law authorities need more information about victims from other countries. In addition, evidence and other key information may be located in a variety of countries around the world.
- More consumer education is needed from news media and consumer groups like BBB.

*By Steve Baker, BBB International Investigations Specialist*

*BBB appreciates assistance provided by FTC and BBB Clearwater.*

*BBB and the Torch Logo are registered trademarks of the Council of Better Business Bureaus, Inc .  All other trademarks, product names, logos, and brands depicted herein are property of their respective owners and are used for identification purposes only and not to imply endorsement.*

15